## GEORGIA RAILWAY AND POWER COMPANY *v.* WRIGHT, comptroller-general, *et al.*

1. The general rule is that where a river is the boundary between two States, if the original property is in neither, and there be no convention respecting it, each State holds to the middle of the stream. The Beaufort Convention of 1787 settled the boundary line between the States of South Carolina and Georgia, which, according to that convention, is the most northern branch or stream of the river Savannah from the sea to the confluence of the Seneca and Tugalo rivers, etc., reserving all islands in the river to Georgia. That part of the Savannah river which is broken by islands, located between an island and the Georgia mainland, is within the jurisdiction and sovereignty of the State of Georgia, and a dam constructed across the river from an island to the Georgia shore is subject to taxation in Georgia.

2. On an appeal to arbitration from an assessment of value placed on un-returned property by the comptroller-general, the arbitrators can not include property in their award which was not embraced in the comptroller's assessment.

OCTOBER 19, 1916.

Petition for injunction. Before Judge Pendleton. Fulton superior court. December 13, 1915.

*Colquitt & Conyers,* for plaintiff.

*Clifford Walker, attorney-general, Z. B. Rogers,* and *Mark Bolding,* for defendants.

EVANS, P. J. 1. The Georgia Railway and Power Company is the owner of a power-plant property located in Elbert county. A part of this enterprise is a dam across the Savannah river from the Georgia side to a small island which lies in the river and is thirty-five or forty feet from the South Carolina shore. The controversy concerns the taxability of the dam in Georgia. The Georgia authorities contend that the whole dam is located within the State of Georgia, and subject to taxation in this State. The power company contends that only about 160 feet of the dam, measuring from the Georgia shore, lie within the jurisdiction of Georgia, and that the rest of the dam is within the jurisdiction of the State of South Carolina. The solution of this part of the controversy calls for a decision locating the boundary line between the States of Georgia and South Carolina at this point.

A little more than a century ago the boundary between these States was the subject of serious dispute. Commissioners were appointed by both States to agree upon and settle a boundary line, which was done by a convention, concluded at Beaufort, South Carolina, and signed by the commissioners, April 28, 1787. In that convention it was agreed that "the most northern branch or stream of the river Savannah from the sea or mouth of such stream to the fork or confluence of the rivers now called Tugaloo and Keowee, and from thence the most northern branch or stream of said river Tugaloo till it intersects the northern boundary line of South Carolina, if the said branch or stream of Tugaloo extends so far north, reserving all the islands in the said rivers Svannah and Tugaloo to Georgia, . . shall forever hereafter form the separation limit and boundary between the States of South Carolina and Georgia." Watkins' Digest, 752. In the first Code of Georgia (Code of 1863, § 18) the boundary line was de-

clared to be "the line described as running from the mouth of the river Savannah, up said river, and the rivers Tugalo and Chattooga, . . conforming as much as possible to the line agreed on by the Commissioners of said States at Beaufort on the 28th April, 1787." In the present code (Code of 1910, § 16) the boundary between Georgia and South Carolina as deduced from the Convention of Beaufort was declared to commence "from the sea, or the mouth of the river Savannah, along the stream thereof to the fork or confluence made by the rivers Keowee and Tugalo, . . until the fork or confluence made by said Tugalo and the river Chattooga," etc., "reserving all the islands in said rivers, Savannah, Tugalo, and Chattooga, to Georgia." The boundary as established by the statutes of Georgia is based on the Convention of Beaufort. In the Code of Laws of South Carolina (1912), § 1, the boundary of that State from Georgia is thus defined: "From the State of Georgia South Carolina is divided by the Savannah river from its entrance into the ocean to the confluence of the Tugalo and Seneca rivers; thence by the Tugalo river to the confluence of the Tugalo and Chattooga rivers; thence by the Chattooga river to the North Carolina line aforesaid, in the thirty-fifth degree of north latitude, the line being low-water mark at the southern shore of the most northern stream of said rivers where the middle of the rivers is broken by islands; and the middle thread of the stream where the rivers flow in one stream or volume." The marginal note indicates that the boundary as thus described is that established by the Beaufort Convention. It is to be noted that the river Keowee is the same river called Seneca in the South Carolina Code. The Savannah river is navigable for a considerable distance from its mouth, and many islands are located within its waters. Its general direction is northwest or southeast. We recognize the general rule to be that when a river is the boundary between two States, if the original property is in neither and there be no convention respecting it, each State holds to the middle of the stream. Handly's Lessee v. Anthony, 5 Wheat. 374 (5 L. ed. 113). Our opinion is that the Beaufort Convention altered the general rule, in that portion of the river where there are islands. In the beginning of the description in the Beaufort Convention, on the hypothesis that the general course of the river was east and west, the boundary was given as "the most northern branch or

stream of the river Savannah from the sea." This language was used to fit the subsequent declaration, "reserving all the islands in the said rivers Savannah and Tugaloo to Georgia." Giving effect to both phrases, the boundary line where there are no islands is the middle of the main current of the river, but in that part of the river where there are islands the boundary line is the stream or fork of the river which lies between the islands nearest the South Carolina shore. Not only is this a fair and proper interpretation of the Beaufort Convention, but if we give it a construction that the middle of the main current of the river in that part where there are islands is the dividing line between the States, we would reach the curious result that islands belonging to Georgia and within the jurisdiction of Georgia would be located within territory belonging to the State of South Carolina, where the main current of the river is between the Georgia mainland and its island. Of course the commissioners never intended such an anomaly as this. If we follow the South Carolina interpretation of the Beaufort Convention as contained in the Code of South Carolina of 1912, the territory of South Carolina extends to the "low-water mark at the southern shore of the most northern stream of said rivers where the middle of the river is broken by islands, and middle thread of the stream where the rivers flow in one stream or volume." The exigencies of the issue in the present case do not demand a ruling that the territory of Georgia extends over the Savannah river, where it is broken by islands, to the low-water mark on the South Carolina shore. The dam stops at the island near the South Carolina shore. But we do hold that all the Savannah river where it is broken by islands, which is between the island and the Georgia shore, is within the jurisdiction and sovereignty of Georgia, and all improvements constructed thereon are property subject to taxation within this State. As to that part of the river which is not broken by islands, the middle thread is the boundary between this State and South Carolina, and it was that part of the river which was involved in the cases of *Simpson* v. *State,* 92 *Ga.* 41 (17 S. E. 984, 22 L. R. A. 248, 44 Am. St. R. 75), and *James* v. *State,* 10 *Ga. App.* 13 (72 S. E. 600), and nothing held therein is in conflict with our present holding.

2. In its petition to enjoin the levy of fi. fas. issued against it by the comptroller-general for State taxes, the Georgia Railway

and Power Company urges that the assessment of a portion of the property was made without notice to it. The judge was authorized to find that the power company owned a property in Elbert county, known as the Gregg shoals property, which includes 138 acres of land, and a dam across the Savannah river, and this property was a unit and used for the development of hydro-electrical power. This property was not returned for taxation to the comptroller-general. The statute provides that whenever the owner of property fails to make a return, the comptroller shall notify the owner, in writing, of his delinquency, demanding that a return shall be made within twenty days. Civil Code (1910), § 1056. On August 11, 1914, the comptroller-general wrote to the Georgia Railway and Power Company that "The Gregg shoals power development in Elbert county" should be returned for taxation to him. The company replied that "the Gregg shoals property formerly belonged to the Savannah River Power Company;" and that "upon its purchase from that company the Georgia Railway and Power Company leased the property to the Anderson Water, Light and Power Company." The comptroller then demanded of the Anderson Company that it be returned for taxation to him, enclosing blanks for that purpose. A correspondence ensued between the Anderson Company and the comptroller-general, culminating in a demand in a letter written on September 10, 1914, for the return of all of the property in Georgia. On the same day the comptroller wrote a letter to the Georgia Railway and Power Company "relative to the Gregg shoals power property in Elbert county," in which he stated he was of the opinion that at least half of the dam and perhaps more than half must be in the State of Georgia, the thread of the stream being the dividing line; and demanded a return of all property located in Elbert county, less what was returned to the Elbert county authorities. On August 2, 1915, the comptroller-general made a formal assessment, which, after a recital that the company had failed to make, on demand, a return to the comptroller-general, as required by law, of the dam across the Savannah river, contained an assessment "of that part of the dam located in the State of Georgia, at $50,000." On September 8, 1915, the comptroller wrote to the Georgia Railway and Power Company that since making his assessment upon the dam, covered by what is known as the Gregg Shoals Power Company, he had discovered

that 138 acres of land connected with the property had been returned previously to the year 1913 to the tax-receiver of Elbert county under the impression that it was returnable to that officer and not to the comptroller together with the dam. He suggested that the expense of an assessment and arbitration of this land independently of the dam could be avoided by a return of it to the comptroller's department, and, if this was not acceptable, he could by consent amend the assessment already made so as to include the land, and save the expense of a double arbitration. On September 13, 1915, the attorneys of the power company wrote the comptroller-general that "we are willing for the arbitrators to consider 136.25/100 acres of land and determine a taxable valuation on this land, with the understanding that you instruct these gentlemen [the arbitrators] that the part of the Gregg shoals dam, the value of which they have been appointed to assess, is the part of the dam in Georgia, taking the current of the main thread of the channel of the Savannah river as the boundary line between Georgia and South Carolina." On September 14, 1915, the comptroller-general wrote to the arbitrators: "You are hereby instructed that in connection with the matters submitted for arbitration of the value of the Gregg shoals development for taxation, you are to take into consideration the value of 136.25 acres of land as a part of the Gregg shoals property, and you are to assess the value only of that portion of the dam which extends from the Georgia shore to the current or main thread of the channel of the Savannah river." On September 16, 1915, in a letter to the arbitrators, the comptroller recalled his former letter to them, and instructed them that, "in connection with the matters submitted to arbitration of the value of the Gregg shoals development for taxation, you are to take into consideration the value of 136.25 acres of land as a part of the Gregg shoals property, and you are to assess the value of all the dam, or so much thereof as extends from the Georgia shore to the boundary between the two States, which runs up the middle of the branch or stream of the Savannah river, separating the island, and just below and contiguous to the eastern end of the dam from the S. C. shore; said boundary line extending from thence up the river to the middle of the branch or stream of said river, which separates the island next above from the S. C. shore." From the foregoing it appears that prior to 1913 the owners of the Gregg

shoals property returned for taxation to the tax-receiver of Elbert county the 136 acres of land. In assessing the unreturned property the comptroller assessed only a part of the dam. The Georgia Railway and Power Company consented that the assessment might be amended on condition that only a part of the dam should be included for taxation. The comptroller consented to this, but afterwards, while the matter was pending on a submission to arbitration, he withdrew his consent. The effect of this was to leave the assessment pending on appeal just as it was originally made. Nevertheless the arbitrators included the 136 acres of land and the whole of the dam in their assessment. It follows that as to a part of the property assessed by the arbitrators, which was not included within the comptroller's assessment, the company was not given the notice required by the Civil Code (1910), § 1056. In view of this ruling, the other questions made in the record become moot, so far as the right of the plaintiff in error to the writ of injunction is concerned. 　　　*Judgment reversed. All the Justices concur.*