## LUCAS *v.* THE STATE.

1. Evidence offered by the accused, to the effect that the police raided the home of the deceased and charged her with selling whisky, was irrelevant on the trial of the accused for murder.

2. On objection to the competency of a child of ten years as a witness, based on her youthfulness, the answers given in response to questions propounded to the child by the judge were sufficient to authorize him to hold the witness competent to testify.

3. Certain statements made by the accused to the arresting officers immediately after his arrest, in regard to the cause for shooting his wife, were objected to on the ground that they were not made freely and voluntarily, and that a proper foundation had not been laid for their introduction. *Held,* that the evidence submitted for the purpose of laying the foundation for introduction of the evidence was sufficient.

4. The admission of the record in a divorce suit by the deceased against the accused was not, under the circumstances of the case, sufficient to require the grant of a new trial.

5. On the trial of a man charged with the murder of his wife, the State introduced evidence tending to show that for some time the man and woman had lived in a certain house; that a few months prior to the homicide the man went to another house to live; and that while living in a state of separation the man returned at night to the house where the woman continued to live, and the two, being alone, engaged in a quarrel about money in her possession to which he made claim, during the course of which quarrel he shot and killed her. In his statement before the jury the accused said that he separated from the woman on account of his opposition to the sale of liquors in which she continuously engaged at the house; and that on the night of the homicide his motive in going to the house was to induce her to stop selling liquors and renew their marital relation, but upon arriving at the house he discovered her on the porch with another man in a compromising position, and, being shocked at the sight, he shot at the man as they started to run, and struck the woman. *Held,* that it was competent, in rebuttal, for the State, in connection with testimony tending to show that the sale of liquors at the house by the woman before the separation was with the approval of the accused, to introduce testimony that on different occasions the accused also sold intoxicating liquors at the house.

6. Certain evidence referred to in the 6th division of the opinion, when considered in connection with other testimony, was admissible for the purpose of contradicting the prisoner's statement.

7. The prosecuting attorney may, on a trial for murder, argue to the jury that they ought not to sentence the accused to imprisonment, because, if they should do so, there is a chance of his being pardoned by the Governor at some future time.

8. The charge excepted to in the 17th ground of the motion for new trial, on the law relative to the prisoner's statement before the jury, was substantially in accord with Penal Code § 1036.

9. The evidence authorized a charge on the law of confessions.

10. The charge of the court set out in the 10th division of the opinion did not amount to an expression of opinion by the judge upon the facts relating to the issues involved.

11. In this case the judge fully and correctly charged as to the prisoner's statement to the jury; and having done so, it was not error, while charging upon the law of reasonable doubt, to refer to evidence or want of evidence as a basis for reasonable doubt.

12. In connection with a statement of the substance of Penal Code § 62, defining implied malice, it was not erroneous to charge: "Wherever it is shown one person kills another intentionally, wherever that appears, and no considerable provocation appears in the case, why then that case would be a case of murder and the law [would] imply malice."

13. The provisions of Penal Code § 72, relating to the right to kill another to prevent a forcible attack and invasion of the property or habitation of the person killing, were not applicable to the facts of this case; but a new trial is not required because of the charge on this subject.

14. Other special grounds of the motion for new trial, so far as approved by the trial judge, are without merit, and are not of such character as to require elaboration. The evidence was sufficient to support the verdict, and there was no error in refusing a new trial.

ATKINSON, J., dissenting. The rulings announced in headnotes numbered nine and ten do not have the concurrence of the writer of the opinion. Under his view there should be a reversal of the judgment, based on the assignments of error dealt with in the corresponding divisions of the opinion.

DECEMBER 19, 1916. REHEARING DENIED JANUARY 11, 1917.

Indictment for murder. Before Judge Mathews. Bibb superior court. May 20, 1916.

Bunyan O. Lucas was indicted for the murder of his wife, Mrs. Ida Lucas, by shooting her with a pistol. It appeared from the evidence that they were living in a state of separation at the time of the homicide. The body of the deceased was found on the floor of her residence in the city of Macon, the head and shoulders being in her room and the other part of her body extending into the front hall near the front door. She was shot slightly above and to the rear of the left ear. The bullet glanced out, but broke the skull, causing it to press upon the brain, and she was dead when discovered. There was blood under the head as it lay on the

floor, but not at any other place. There were burns under the ear and on the left hand and arm. The homicide occurred about nine o'clock on Saturday night, and the accused was arrested at a small railroad-station a little over four miles from Macon, about two o'clock Monday morning, where he was lying on a bench. On the trial a girl child of the deceased testified that about nine o'clock· on the night of the homicide she saw the accused at a drug-store opposite a church five or six blocks away from the residence of the deceased, and conversed with him. In the course of the conversation, in response to questions asked by him, she stated that her mother was at home, and that her brother was there when she left. The girl had gone to church, and pending the services had left to go to the drug-store to get a drink of water. After her conversation with the accused she went back to the church, and "started home about twenty minutes after that. I got home about twenty minutes after nine. When I got there, there were no men in the house,—no one but mama; she was lying in the hall from here [indicating on her body] up on the hallway. I tried to get in the house, and I couldn't find the handle to the screen door. It was broke off." So far as necessary· to an understanding of the decision of the case, other facts shown by the evidence will sufficiently appear in the opinion of the court. The defendant was convicted, without recommendation to mercy. A motion for new trial was overruled, and the defendant excepted.

· *Napier & Maynard* and *John R. Cooper,* for plaintiff in error.

*Clifford Walker, attorney-general, John P. Ross, solicitor-general,* and *Mark Bolding,* contra.

ATKINSON, J. 1-2. The rulings announced in headnotes one and two do not require elaboration.

3. When the girl left the accused on Saturday night at the drug-store, she returned to the church and the accused went to the house of the deceased. When the girl returned home immediately after church service she discovered the body of her mother lying as indicated in the statement of facts. The deputy sheriff and the jailer of the county, about two o'clock Sunday night following, found and arrested the accused at the M. & A. junction on the Central Railroad, a little more than four miles from the city. The deputy testified concerning the discovery of the accused, and his. arrest and conversations with him, in effect as follows: Since the

discovery of the homicide there had been a general search for the accused; and learning that he was at the railroad junction, the officers went to that place. They found him in a little waiting-room, "lying down on a bench, side of the wall, on his elbow." The deputy further testified: "I had a flashlight. I flashed my light. I had a gun in this hand, and when I flashed my light it looked like he was going to rise; and I says, 'Lay still; I don't want to hurt you;' and Tom [the jailer] remarked 'What in the world did you do this for?' and I says, 'Take his pistol,' and Tom says, 'Give it to me,' and I says, 'No, you leave your hands right where they are.' Tom caught hold of both his wrists, and I says, 'Reach your hand in his pocket and give me his pistol.' I told McCommons [the jailer] to hand me the pistol; and he asked us not to handcuff him, and I says, 'It won't hurt you to be handcuffed to go to jail.' We were talking going along to the automobile, we were walking along, and I asked him, I says, 'Mr. Lucas, you were separated from your wife,' and he says, 'Yes,' and I says, 'What were you doing over there?' and he says, 'I went to take a letter that came to my house from some piano firm, and when I got there she asked me what I wanted,' and he says, 'I told her, "Here is a letter that came to my house, and I wish you would have your mail come to your house instead of mine," and she says, "You need not have brought it; I don't want you here anyway,"' and finally I says, 'When did you shoot her?' and he says, 'When she turned to go into the house.' Mr. McCommons says, 'You lived with your wife about a year before you married her, didn't you?' and he says, 'Yes,' and they said some few words, and they were talk-ing, and in a few minutes, I says, 'If you had separated from her, you had no right over there,' and he says, 'Well, if you loved a woman like I loved her, you would do almost anything,' and he says, 'I can not stand to see her going out automobiling with dif-ferent men,' and I says, 'Were you drinking?' and he says, 'No,' and I says, 'You hadn't had a drink,' and he says, 'No, I don't drink,' and he said since he had lost his job at the railroad he had not had right good sense, or hadn't been in his right mind, and I asked him which way he went after he left the house, and where he went. He said some street. I know he said he went to the Geor-gia Southern Railroad out towards Sofkee and Wellston. He said after he left the house he went to the Georgia Southern and stayed

there that night and next day and Sunday night. He came in town and went to the M. & A. junction; and I asked him if he met anybody at Proctor & Gamble's and talked to them; he said, no, he hadn't seen a soul since he left the house until he was caught that night, and he said he hadn't had a mouthful to eat or a drink of water since Saturday night. He said after the shot was fired he left the house. He said she had been arrested for selling whisky, which caused him to lose his position at the railroad, and he had been worried so he hadn't been exactly right." On cross-examination the witness testified: When arrested "Lucas was in a reclining position, lying down in the waiting-room; he had his eyes open. As far as I know, the first he knew of my presence was when I flashed the light on him and pointed the gun at him. I told him to lay still, I did not want to hurt him. The way that happened, he was lying down there, and I says, 'I don't want—' I might have said 'kill you,' or 'I don't want to hurt you, or you hurt me;' I don't remember the exact words; and after we got him handcuffed I says, 'It won't hurt you to handcuff you; it may save you from getting hurt, or some of us.' To the best of my recollection, I told him that I did not want to hurt him. He got up from the reclining position while I had the shotgun pointed at him. He kept his hands in front, and I told McCommons to take the pistol. Mr. McCommons caught hold of his wrist, and the porter took the pistol from his pocket and gave it to me. He asked me not to handcuff him. I think Mr. McCommons said 'What in the world did you want to do that for?' and I had the shotgun pointed at him at the time, and I put the gun on him at the same time I flashed the light. I didn't keep the gun on him after he was handcuffed. I asked him as we were walking along, I says, 'You are separated from your wife;' it was at the same time we were going along to the automobile, and he told me that he had lost his position with the Macon, Dublin & Savannah Railroad on account of his wife being charged with selling whisky, and he said he loved her, and he said he went there to take a letter from a piano house about a piano, and he says when she turned to walk off to go in the house, I believe is what he said, he shot her. I have been there to the house twice. The front door is the only way intended to go in the house from the front." By the court: "The gun was pointed at him before we put handcuffs on him. The conversation I had

with him was after I handcuffed him.   We were just walking along
like two or three men would be to the automobile.   We had not
made any threats or held out any hope of reward to him to make
the statements.   After he was arrested and handcuffed we were all
three talking; may be Mr. McCommons would ask him a question,
and may be I would say something to him; we were just walking
along talking.   All that conversation I have testified to took place
before we got into the automobile, and we talked some after we
got into the car, and we talked some after we got to the jail; and
I told him I was sorry for him, and I would do what I could for
him.   I don't know whether defendant gave any answer to Mr.
McCommons' first question."   On redirect examination:   "He
started to rise, and I says, 'Lay still,' I says, 'I don't want to hurt
you, and I don't want you to hurt me.'   I think that is what I
said.   When I flashed the light he started his hand to his right
hip-pocket, and I says, 'Don't move your hand, lay still, I don't
want to have to hurt you.'   I got the pistol out of his right-hand
hip-pocket.   I made no statement to the defendant about the homi-
cide while I had the gun pointed at him.   I made no inquiry about
it.   As soon as Mr. McCommons handcuffed him I stopped point-
ing the gun at him.   I was holding the flashlight and gun in the
same hand.   From the time I got the pistol I did not say any-
thing to him about the homicide.   He made no statement as to
how it happened, at that time.   It was after we had a talk coming
to the car that I told him that I was sorry for him and would do
what I could for him.   It was after he told me about shooting
the deceased."

The defendant objected to the admission of this testimony, on
the ground that no foundation had been laid to admit an alleged
confession, and that the statements of the defendant were made
under fear and intimidation as well as by hope of reward.   The
objection was overruled, and one ground of the motion for new
trial complains of the admission of the evidence over such objec-
tion.   In a different ground of the motion complaint is made of
another ruling by the judge, whereby he admitted, over the same
objection, testimony of specified questions propounded to the ac-
cused by the deputy, and answers to them, which did not embrace
any other matter.

It is unnecessary to discuss the rulings here complained of, fur-

ther than to call attention to the fact that it appears from the evidence of the deputy, relating to the statements made by the accused, that all of the statements were made after he had been arrested and had been told that the officers were taking him to jail, and that the expression of sympathy for the accused was made after the defendant had made his statement to the officers. The recital of the evidence shows that the judge did not err in holding that sufficient foundation had been laid for admitting testimony of the statements made by the accused. *Wilburn* v. *State*, 141 *Ga.* 510 (81 S. E. 444).

4. The ruling announced in the fourth headnote does not require elaboration.

5. Up to within a few months before the homicide the accused and the deceased had been living together in the house in which the homicide occurred. Certain evidence to the effect that the accused, on several occasions before the separation, had sold intoxicating liquors at the house in which he and his wife lived was admitted over objection that the accused had not put his character in issue, and that the testimony tended to show a crime other than that for which the defendant was being tried, and was irrelevant. No eye-witness to the killing was produced at the trial; but a witness, who testified that he was in an adjoining house, gave testimony as to an altercation between persons whom he recognized by their voices as the accused and the deceased, and as to hearing the shot fired immediately after hearing the accused say: "I have stood it as long as I am going to. I have talked until I won't talk a ―――― bit more." Other evidence was, that, several months before the homicide, a neighbor had, at the request of the deceased and the accused, received for safe-keeping certain money, which was later turned over to the deceased. After the money had been delivered to her the separation occurred, the accused going to another place to live. There was also evidence that shortly after the separation the accused went to the house of the deceased and sought permission to return, but was refused; whereupon the accused called her vile names and told her he "had to have half of the money by night, or get her ―――― head." In his statement before the jury the accused said, that, while he was away at his work on the railroad, the deceased was summoned to court for selling whisky, and when he telephoned her as usual on his return home, she said:

"Hurry home;   . .   some men left some whisky for a fishing party," and she had been summoned to court; also that later . she had been indicted, and a few days afterward "I was held off my job, and later discharged for something she had done and I knew nothing about.  After I was discharged she told me she had been selling whisky, and I told her that was wrong and wouldn't do,'  . .   and she says, 'Since I have told you, I am going to sell it right on.'  . .   I got on my knees and begged her  . .  to . .  quit it, and she wouldn't do it.  . .  She told me  . .  if I didn't want to see her sell it I would have to leave or could leave. . .  I decided to leave for a few days, to see if it wouldn't get her to stop; but it wouldn't.  I asked her when I left if 1 could call back to see her sometimes, and she says I could; and every time I would go I would get on my knees and beg her to cut it out, and we could go back together and live happy and move away from Macon.  She wouldn't do it, though."  In other portions of the statement the accused said, in effect, that on the day of the homicide he came to town to see about getting a job.  He redeemed his pistol from a pawnshop, and went around town for several hours with some friends.  He had received a letter from a company from which he had bought a piano, asking for payment, and after supper started to see the deceased about it, and "give her some money to send in payment, and have a talk with her."  On the way he stopped in a drug-store, where he met the girl child of the deceased by a former marriage, who, upon being asked, said that her mother was at home with the child's brother.  The statement then proceeds: "I went there expecting to find my wife at home and have a long talk with her, and get back together; and when I got there I found her and [another man] on the porch" in a compromising position.  "This shocked me and caused me to go plumb crazy, and seeing them in this position they started to run in the house, and I fired to hit the man and not her, because I loved her too much to hurt her."  It was in rebuttal of the statement that the evidence which was admitted over objection was introduced.  It appeared from the evidence of the witness whose testimony was objected to that the liquors which the accused sold consisted of whisky and beer, both of which were kept and sold in the house in which the accused and deceased lived before their separation.

.From what has been stated it will be perceived that it was in question whether the accused separated from his wife on account of her engagement in the illegal sale of liquors, and was trying to get her to desist and resume marital relations with him when he discovered her in a compromising position with the man, and, in an effort to shoot the man to prevent a debauchery that was imminent, he shot his wife; or was his objection to the sale of liquors feigned, and, without any other man in the case, was not the real motive for going back to the house and killing the deceased the refusal of the woman to divide the money? Under this view, the evidence as to the accused having kept and sold liquors in the house before the separation was relevant as tending to discredit the statement of the accused. Being relevant upon a material issue, the evidence is not inadmissible merely because it may tend to show the accused guilty of offenses other than the crime for which he is on trial, or because it may tend to impugn his character. *Frank v. State*, 141 *Ga.* 243 (80 S. E. 1016).

6. The 9th ground of the motion for new trial assigns error upon the admission in evidence of a letter from a certain company in Chicago, Illinois, addressed to B. O. Lucas, 748 Boundary St., Macon, Georgia, which had reference to payment due "on a piano account." The objection was that the letter was irrelevant and hearsay. In connection with the document a postman testified that on the morning of the homicide he delivered a letter similar to that at the house where the deceased was killed. The child of the deceased identified the letter as one which he had found on the bed in his room, in the house of the deceased, on the same night and shortly after the homicide. The evidence showed that the letter was addressed to the accused and had reference to a payment on the piano. In his statement before the jury the accused gave as one of his reasons for going to the house that night that he had received a letter from the company from which he had purchased the piano, demanding payment thereon, and that he was carrying it with him to give to his wife, with money to meet the payment. He made a similar statement to the arresting officer. It is to be inferred from his statement before the jury that the accused did not go into the house on the night of the homicide after reaching there. The fact that the letter, delivered in the morning by the postman at the house of the deceased and found that night after

the homicide by the child of the deceased in one of the back rooms of the house, was of similar import to the letter which the accused stated he had received at another address, tended to contradict the statement of the accused and was admissible for that purpose.

7. Another ground of the motion for new trial complains of the refusal to grant a mistrial on the ground that the solicitor-general, during the progress of his argument before the jury, stated to them: "Give him a life sentence and take your chances of his being pardoned by the Governor." It was alleged that this remark was unauthorized and prejudicial to the accused, and that the court failed to rebuke the solicitor-general or to instruct the jury with reference thereto. The ground of the motion contains a statement from the solicitor-general, denying the use of the words excepted to and stating his version of what he said, which, though in different language, embraced the substance of that to which the defense excepted. There was no merit in this ground of the motion for new trial. In this State "The punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life in the following cases: If the jury trying the case shall so recommend, or if the conviction is founded solely on circumstantial testimony, the presiding judge may sentence to confinement in the penitentiary for life. In the former case it is not discretionary with the judge; in the latter it is." Penal Code, § 63. In *Cohen* v. *State*, 116 *Ga.* 573 (42 S. E. 781), it was said: "The jury in the trial of one who is charged with murder, if they find the accused guilty, are invested by law with the power of fixing the punishment, by recommendation to life imprisonment. Whether they will so recommend or not is a matter solely in their discretion, which is not limited or confined in any case. Accordingly, where the jury were instructed that they had such right, full and untrammelled, but in the same connection they were also instructed that the law allows such recommendation in cases where they think there are circumstances of mitigation, and in cases where in their judgment they do not think the death penalty ought to be inflicted, a verdict of guilty without a recommendation must be set aside, because it is possible that the jury may not have fully understood the extent of their power as defined by the law." In *Hill* v. *State*, 72 *Ga.* 131, it was held: "The code leaves it in the discretion of the jury as to whether they will recommend imprison-

ment for life in the penitentiary of a person convicted of murder; they are not limited or circumscribed in any respect whatever; nor does the law prescribe any rule by which the jury may or ought to exercise this discretion. Therefore a charge that the jury, in considering the question of recommending to mercy, should not be governed by their sympathies, but by their judgments, approved by the evidence in the case and the law applicable to it, was error." In *Taylor* v. *State*, 105 *Ga.* 746, 781 (31 S. E. 764), it was said: "It is further complained that the court charged the jury as follows: 'If the jury are satisfied beyond a reasonable doubt of the guilt of the defendant of the offense of murder, and do not desire that he should suffer the death penalty, the form of your verdict would be, "We, the jury, find the defendant guilty, and recommend that he be imprisoned in the penitentiary for life." If the jury find that the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offense of murder, and do not desire to reduce his punishment to imprisonment in the penitentiary for life, but do desire that he should suffer the death penalty, the form of your verdict would be, "We, the jury, find the defendant guilty."' And in charging further, in reference to a recommendation to life imprisonment, that 'It is not controlled by any rule of law or evidence; it is not controlled by anything except the wishes of the jury trying the case.' It was contended by the able counsel for the plaintiff in error that these clauses of the charge make the recommendation to imprisonment for life, or the refusal to so recommend, depend on the wishes of the jury, whereas such recommendation might be exercised by the jury in the quality of mercy, or be controlled in deference to some line of public policy. It is undeniably true that if, in returning a verdict of guilty where the facts authorize a conviction for murder, the jury, being actuated by a wish or desire to show mercy to the accused, incorporate in their verdict a recommendation to life imprisonment, or do so or fail to do so from motives of public policy, this is but an exercise of the right with which they are invested. But this power to recommend, and thus fix the punishment, does not necessarily arise from regard to public policy or a wish to exercise mercy. These reasons may influence the jury, or other reasons may. The jury is not limited or circumscribed in any respect. It is in their discretion whether they will or will not recommend, and the law pre-

scribes no rule for the exercise of that discretion. Penal Code, § 63; *Hill* v. *State,* 72 *Ga.* 131; *Thomas* v. *State,* 89 *Ga.* 480 [15 S. E. 527]. It is possible that there may be better words to use in this connection than to say that the reduction of the punishment is to be governed by the wishes of the jury in that regard. For ourselves, we think little, if anything, can be added to the words of the statute without qualifying it. Yet, after all, as the whole matter—the recommendation as well as the refusal to recommend —is in the power and discretion of the jury, and, when exercised, no tribunal can review or call in question the exercise of that discretion, it is a matter which the wishes of the jury must determine; and we can not hold it error to so charge." It thus appears from the statute, and the decisions of this court applying it, that in all cases of conviction for murder, whether or not the jury would recommend a life imprisonment is within the discretion of the jury. They may do so with or without a reason, and they may decline to do so with or without a reason. They may do so as a matter of public policy, or out of mere sympathy for the prisoner, or they may decline to do so for reasons of public policy, or on account of absence of sympathy for the accused. The question of recommendation has nothing to do with the issue as to guilt or innocence of the accused. The granting of it in cases of conviction is mere matter of grace that comes after guilt is established. In view of the broad discretion of the jury, it is not improper to allow counsel to refer to the possibility of the accused, at some future time, being pardoned by the Governor if he should be recommended to mercy by the jury. In *Ozburn* v. *State,* 87 *Ga.* 173 (13 S. E. 247), it was said, on page 182: "Under our law, juries trying murder cases have the right to avert the death penalty by recommending life imprisonment; and it is therefore not improper for counsel to argue before them the question whether or not they should so recommend. It may not be proper for counsel to state that they should not recommend life imprisonment because the Governor of the State might pardon the defendant, and he would therefore be set free; but if such a statement is made, and the attention of the court is not called to it, and he is not asked to make any ruling thereon, it will afford no ground for a new trial." But this was not a ruling that it would be cause for a new trial for the solicitor-general to make such an argument before the

jury.  The actual ruling made in the case was:  "On the trial of a murder case, counsel for the State may comment before the jury upon the propriety or impropriety of their recommending imprisonment for life as a punishment."  In McNeill *v.* State, 102 Ala. 121 (15 So. 352, 48 Am. St. R. 17), it was held:  "The prosecuting attorney may, on a trial for murder, argue to the jury that they ought not to sentence the accused to imprisonment, because if they do so he may obtain a pardon afterwards through the solicitation of his friends."  In the course of the opinion it was said:  "No fact was stated by him; but to the contrary all he said was but the expression of his opinion or anticipation as to what would be the result of committing the defendant to the penitentiary for life instead of inflicting the death penalty—an argument for the death penalty proceeding on considerations the reasonableness of which was as much open to the jury as to counsel; and nothing said was beyond the limitations put upon the remarks of counsel to the jury by repeated decisions of this court."

8.  The ruling announced in the 8th headnote requires no elaboration.

9.  In the 19th ground of the motion for new trial complaint is made of the following charge:  "Some evidence is offered here as to a confession claimed by the State to have been made by the defendant.  These confessions have been admitted to be considered by you.  I charge you, however, with reference to these alleged confessions, that, before you will consider them in the case, you must believe that they were made voluntarily without being induced by another by the slightest hope of benefit or the remotest fear of injury.  If you do not believe that they were freely and voluntarily made, as the law requires, you would not consider them in the case.  If you think that they were freely and voluntarily made, that no compulsion was used, no inducement held out, or reward, no threats of punishment, or injury,—that they were made without reference to anything of that sort, then you would be authorized to accept them and consider them in the case.  The rule is that they must be received with great caution, and scanned with care. See if they were made, and see if they were freely and voluntarily made.  A confession alone, uncorroborated by other evidence, will not justify a conviction."  The exceptions to the charge were: (*a*)  The court assumed that confessions had been made by the

accused, and the charge amounted to an expression of opinion to that effect. (*b*) No evidence of confession was introduced. (*c*) If the evidence showed a confession, the same evidence showed that it was not freely and voluntarily made. The objection last stated is disposed of, contrary to the contention of the plaintiff in error, by the ruling announced in the third division of this opinion, because the incriminatory statements there referred to were the same to which allusion is made in the above excerpt from the charge of the court as to confessions. The majority of the court are not in accord with the writer as to whether or not the statement made by the accused to the arresting officer amounted to a confession of guilt, so as to authorize a charge on the law of confessions. The view of the majority on this subject follows: The evidence that on the night subsequent to the homicide the accused said to the arresting officer that he had been separated from his wife and went to the house where his wife lived, to take a letter from a piano house about a piano, and that when his wife turned to go into the house he shot her, and that after the shot was fired he left the house, is sufficient to establish a confession of guilt by the accused of the murder of his wife by shooting her as charged in the indictment. Inasmuch as the law, in the absence of mitigating circumstances, declares a homicide to be felonious and done with malice, the confession by the accused that he did the act which produced the death of his wife is a confession that he killed her; and this proposition is established by the case of *Webb* v. *State*, 140 *Ga.* 779 (79 S. E. 1126). The majority of the court do not think there is any merit in this ground of the motion. The writer dissents from this view, for the following reasons: The charge stated broadly that confessions were involved in the case. There is a distinction between confessions and incriminatory statements, which can not be made plainer than to state that the former is a voluntary statement by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged; whereas in the latter he admits only one or more facts entering into the criminal act. *Owens* v. *State*, 120 *Ga.* 296 (48 S. E. 21). In the case cited, after giving certain definitions which the court adopted, it was said by Evans, J.: "These definitions of a confession imply an admission of every essential element necessary to establish the crime wherewith the defendant

is charged. Unless the statement of the defendant is broad enough to comprehend every essential element necessary to make out the case against him, it can not be said to be an admission of guilt." In the same case it was also said that it is error to charge upon the subject of confessions where there is no evidence upon which to support the charge. See other cases to the same effect cited in *Weaver* v. *State,* 135 *Ga.* 317, 321 (69 S. E. 488). In the case of *Jones* v. *State,* 130 *Ga.* 274 (60 S. E. 840), a statement of the defendant charged with murder was held to be a confession,—it appearing that in the statement there was an admission of an intentional killing of the deceased, accompanied with a statement of the reasons moving the accused to commit the homicide, and that the reasons given were not sufficient to furnish any legal excuse or mitigation. This latter ruling did not qualify or extend what has just been quoted from the opinion in *Owens* v. *State,* supra. It was merely restating what was there said in other language; because, where the statement by the accused showed affirmatively all that it did in *Jones* v. *State,* supra, it stated every material fact which the law denounces as murder, with which the accused was charged. It was immaterial whether the accused made his confession in that form, or in some other form which amounted to complete acknowledgment of his guilt of the offense with which he was charged. In the case of *Webb* v. *State,* supra, it was held: "Where, on the trial of one indicted for murder, the evidence on behalf of the State showed that the decedent was shot by the accused just outside of a house, and a witness testified that just after the shooting the accused had a pistol in his hand, that his wife and the witness, hearing shooting, were going out of the door of the house, and that the accused told them to get back out of the door, as they were liable to get shot, and that he had got one man (applying a vile epithet to him) 'falling on his knees now,' and did not know who it was, such evidence authorized a charge to the effect that all confessions of guilt should be received with great caution, and that a confession uncorroborated would not be sufficient to warrant a conviction" (citing *Jones* v. *State,* supra). The note does not fully state the case as appears from the original record in this court. All the evidence showed that deceased was shot in the neck as he was walking up the steps, and he sank to the ground, expiring immediately. The house was crowded and

excitement prevailed, and some minutes afterwards the statements referred to as confessions were made by the accused while standing at the door at which the body of the deceased was lying. Under these circumstances it is possible that the language of the accused might be construed by the jury as meaning that he had intentionally killed the deceased without mitigating circumstances. If the ruling in this case is in conflict with *Owens* v. *State,* supra, which has been followed in other cases where all the Justices concurred (*Graham* v. *State,* 125 *Ga.* 48, 53 S. E. 816; *Smith* v. *State,* 125 *Ga.* 296, 298, 54 S. E. 127), it must yield to the rulings in the older cases. There could be no murder without the victim of the shooting being killed; and to make a complete confession of murder, the statement of the accused should extend to that element of the offense as well as to any other element. If one material element might be omitted, another and another could be omitted, until the distinction between confessions and incriminatory statements would be extinguished. In the case now under consideration, it does not appear that at the time the accused made the incriminatory statements to the arresting officers he knew that the woman was dead. It appeared that immediately upon the shooting he fled, and it was about two days before the statements were made, several miles away from the place of the shooting. In propounding questions to him, the arresting officers did not state that she was dead, and in his answers which were relied upon as confessions he did not state that she was dead. The case differs in its facts from the case of *Webb* v. *State,* supra, and, under the circumstances, the statements attributed to the accused did not amount to confessions, and it was erroneous for the judge to charge the jury on the law of confessions.

10. The judge charged: "The theory of the State is that the two, the defendant and Ida Lucas, were together, with no one else in the house with them, and that he shot and killed her then and there. If that is the truth of the case, then the law presumes him to be guilty of murder, until the contrary appears, or circumstances of alleviation, or excuse, or justification. If that is the true theory of the way the killing occurred, and if no explanation appears showing any provocation given by her to him, and you so believe beyond a reasonable doubt, then you would be authorized and it would be your duty to find the defendant guilty. I charge

you, in this connection, that to support the theory of the State as I have just outlined to you, that the evidence is circumstantial." Error was assigned upon this charge, on the ground, among others, that it amounted to an expression of opinion by the judge that the theory of the State as to the circumstances connected with the homicide was supported by circumstantial evidence, thereby invading the province of the jury. Taking the charge in its entirety, the excerpt is not subject to the criticism made against it. The jury could not have otherwise understood the judge than that the State was relying upon circumstantial evidence to support its theory, and not that the State's theory of the circumstances under which the decedent lost her life was established by the circumstantial evidence offered by the State.

11. Several grounds of the motion for new trial complain of excerpts from the charge where the judge was instructing the jury on the subject of reasonable doubt. In so much of the charge as was set out in the excerpts the judge made no reference to the prisoner's statement, but in each instance referred to the "evidence," or the want of "evidence," as a basis for reasonable doubt. The exceptions to the charge were on the ground that it excluded consideration of the prisoner's statement by the jury in passing on the question of reasonable doubt. In other portions of the charge the judge properly instructed the jury in regard to the prisoner's statement; and when the charge is considered in its entirety, the excerpts upon which error was assigned were not of such character as would tend to exclude consideration of the prisoner's statement by the jury in passing upon the question. *Vaughn* v. *State,* 88 *Ga.* 731 (4), 733 (16 S. E. 64); *Frye* v. *State,* 141 *Ga.* 789 (3) (82 S. E. 135).

12. Error was assigned upon the charge: "Wherever it is shown one person kills another intentionally, wherever that appears, and no considerable provocation appears in the case, why then that case would be a case of murder and the law [would] imply malice." The criticism upon this excerpt from the charge was that it did not correctly state the law, and that the court should have added, "that all the circumstances of the killing show a malignant and abandoned heart." It was alleged that the effect of the charge was to tell the jury that if the accused had killed the deceased, having no considerable provocation for the killing, but

having some provocation, then he would be guilty of murder. The defendant could have killed the deceased with no considerable provocation, but, having some provocation, would have been guilty of manslaughter, provided the provocation was such as to produce violent and sudden heat of passion, supposed to be irresistible. The excerpt from the charge upon which error was assigned is a part of a paragraph, the whole of which is as follows: "The charge in this case is murder. Murder is the unlawful killing of a human being in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied. Express malice is the deliberate intention unlawfully to take away the life of a fellow creature, manifested by circumstances capable of proof. Wherever one person makes up his mind unlawfully to kill another, with any degree of deliberation, and executes that intention, why then that is a case of murder with express malice. But the law implies malice in every case of an unlawful killing where no considerable provocation occurs, and all the circumstances of the killing show a malignant and abandoned heart. Wherever it is shown one person kills another intentionally, wherever that appears, and no considerable provocation appears in the case, why then that case would be a case of murder and the law [would] imply malice." The Penal Code, § 62, provides: "Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." It thus appears that the excerpt from the charge upon which error was assigned was given in connection with a statement of this provision of the Penal Code defining implied malice. When considered in connection with the other portions of the charge, the portion excepted to was not erroneous.

13. Error was assigned upon the charge: "If, after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another." It is argued that this charge was inapplicable to the facts proved in the case, and was confusing to the jury; that there was no contention by the accused that any attack and invasion had been made upon his property or habitation, but that he contended that

he shot at the man who had debauched, or was about to debauch, his wife, and inadvertently shot his wife, and that the shooting was for the purpose of preventing the debauching. The charge complained of was a statement of a principle expressed in the language of Penal Code § 72. In the former divisions of this opinion the facts of the case have been sufficiently stated to illustrate that the principle charged by the court was inapplicable to the case; but the error, under the facts of the case, is not such as to require the grant of a new trial.

14. The ruling announced in the 14th headnote does not require elaboration.

*Judgment affirmed. All the Justices concur, except Atkinson, J., dissenting.*

### ON MOTION FOR REHEARING.

The grounds of the motion for rehearing are without merit. With reference to the ground that the case had been orally argued in the Supreme Court before Mr. Justice Gilbert had qualified as a Justice of this court, this statement is made: The case was orally argued during the incumbency of Mr. Justice Lumpkin, and he having died subsequently to the argument, Mr. Justice Gilbert was appointed as his successor. After qualification of the appointee, the court promulgated an order directing this case and others to be reargued on briefs to be filed by counsel; it being stipulated in the order that upon failure of counsel to file additional briefs, cases covered by the order would be considered as submitted on briefs already filed. After the date upon which cases were to be reargued this case was considered and decided.