## MINTER v. THE STATE.

1. The evidence was sufficient to authorize a charge on the law of confessions.
2. The act of the legislature creating the County of Coweta (Acts 1826, p. 57) extended the territory of that county eastward to the east bank of (formerly) the principal western branch of Flint river (now) "Line Creek," including the whole of the bed of that stream. The venue for trial of crimes committed on the waters of that stream is in Coweta County.
   (a) The provisions of the Penal Code (1910), § 23, conferring jurisdiction for criminal trials in either of two counties, where the crime was committed on a stream that is the boundary between the counties and the evidence does not clearly disclose in which county the crime was committed, do not apply to the counties of Coweta and Fayette as to crimes committed on Line Creek.
   (b) While the instruction giving Penal Code § 23 in charge to the jury was inapt, as the evidence bearing upon the question of venue demanded the verdict that was rendered, any error in giving the charge is not cause for a reversal.
   (c) No ruling will be made on the assignment of error as to constitutionality of § 23 of the Penal Code of 1910.
3. The judge did not err in omitting to charge the law relating to involuntary manslaughter in the commission of an unlawful act.
4. The evidence was sufficient to support the verdict, and the judge did not err in refusing a new trial.

No. 4060. APRIL 19, 1924.

Murder. Before Judge Roop. Coweta superior court. November 9, 1923.

Grady Minter and his father, J. W. Minter, and others were jointly indicted in Coweta County for the murder of Millard Trouton, alleged to have been committed in that county. Grady Minter, hereinafter called the defendant, was placed on separate trial and found guilty, the jury recommending him to the mercy of the court. He made a motion for a new trial upon the general grounds, and upon alleged error in the charge of the court on the subject of venue and confessions, and upon the omission to charge the law of involuntary manslaughter as it related to the killing of a human being in the commission of an unlawful act. The motion for new trial was overruled, and the defendant excepted.

The evidence at the trial, in so far as necessary to be stated, tended to show the following: Arnold's bridge extended over Line Creek on the public road between Senoia in Coweta County and Fayetteville in Fayette County. The bridge had an arch at the

center, and was about ninety feet long. The creek was about sixty feet wide at the bridge. The victim was seized at night in the City of Newnan in Coweta County, and carried in an automobile to the bridge. The automobile stopped in Coweta County near the end of the bridge, and the victim was taken out. He was then carried to the center of the bridge, and, with his legs and hands bound with a rope and his body weighted with a rock tied at the chest, was thrown into the creek. It was thought that the victim was heard swimming and the defendant with one of his codefendants went below the bridge on the Fayette side and struck matches to see if "he had sunk," while two other defendants did likewise on the Coweta side. Nothing was seen or heard of him, and the defendants left in the automobile. Several days later the body in a badly decomposed condition was found in the stream about one hundred yards below the bridge. The body was lying face downward with head up stream, the back and shoulders being out of the water, and the face, feet, and hands under the water. After the body was found the defendant was arrested and charged with the murder. After this arrest and charge he made a statement "concerning the death of Millard Trouton." The statement was reduced to writing and signed by the defendant, and was as follows:

"Friday afternoon, August 10th, 1923, we came down here, myself, Jeff and Papa, Will Minter and Floyd Weldon, Leon Goodrum. We came from Atlanta. Stopped at filling-station and got some oil and drove on out the road west of town. About dark we drove back of the brick store out from town, and Millard he came on down. And he passed the car and said something and went on up the street. Papa went on up the street after him and caught him by the arm, at least he had him by the arm when I next saw him. I came on out in the road, and Jeff and Papa had him by the arm. We all went on down to the brick store, and got in the car. From that we drove on out that road and turned to the left and went the Smokey road back to town, coming by a school building and went out the old Sharpsburg road to my papa's house. We got some rope and chains. Papa and others got the chains. I stayed in the car. Papa had the chains and rope when they came back. Trouten got out of the car and took a leak. From there we drove on to Line Creek. When we got

down there Floyd he got out first and walked on across the bridge. Then Papa he got out. Then I got out. Then Jeff he reached over and got Millard, that's Trouton, and they got out. When they got out I caught Millard by the arm. Papa says, 'Lay down, boy, I want to tie you.' He tied his feet and legs. I was holding his hands. Papa tied his hands behind him. And Papa and myself picked him up and carried him on the bridge. Then we tied a rock on him when we got on the bridge. Then we threw him in, his hands had gotten loose. Me and Floyd went down on the far side, or Fayette side, Jeff and Papa were on this side. Struck matches to see if he sunk. We thought the rock had come loose, sounded like he was swimming. That is the last we knowed of him. We didn't see him any more. Before we threw Trouton in the creek, he asked us what we were going to do with him, whether we were going to whip him or kill him. Papa told him that he was going to kill him. Then Trouton said, 'If you will just whip me and turn me loose I leave.' When Papa said, 'Well, boy, I think that you have had plenty of chances. I've told you that I didn't like you, and had rather for you never to come back to my daughter; you know that you have been daring me. You've had your chances, and now I think it is mine.' We stopped on this side of the bridge and took Trouton out. Goodrum went on across the bridge with the car and turned around and came on back on this side. He was gone some time on account of a car being stuck in the mud, and he had to wait until that car got out. When he got back to the bridge we had done thrown Trouton in the creek. We come on back to my brother-in-law's, Claud Washington. Pretty late. We got some oil. The A., B. & A. train was standing at the station when we came through Senoia on the way back from the creek. Claud Washington lives at Turin, at Mr. Drake's. Me and Leon Goodrum got the oil out of Claud's car, from the motor, and put it in our car. Claud drew the oil out of his car, and then me and Leon put it in our car. We came by Sharpsburg and went back to Atlanta. Didn't come back by Newnan. Took some road from Sharpsburg. Turned to the right just in front of a store in Sharpsburg, went one block, and then turned to the left and went on to Atlanta. Two men were with Trouton when he came up the street to where we were, there at

9

the brick store.  I make the above statement freely and volun-
tarily, and to the best of knowledge is true."

Testimony of a deputy sheriff as to other statements was as
follows: "He said he held him and his father tied him and he
throwed him overboard and he didn't have a thing to regret, and
he said if it was to do over that he would do it again.  He said he
struck matches; he said him and Floyd Weldon was on one side
of the creek, and his father and Jeff on the other side striking
matches to see if he had sunk. . . He said he was alive when
they throwed him in the creek.  He said he was tied with a rope
and a rock tied to him, and throwed him overboard in the creek.
He said his feet was tied together and his hands were tied to-
gether, and he said a rock was tied on his breast.  He said him
and his father picked him up and throwed him off the bridge in
the water. . . He said all the time he knew they were going
to do something to him; he didn't know what they were going to
do, but he was going to do his part.  He didn't know what they were
going to do when they stopped down there.  He had no idea up
to the time they got to the bridge.  He said he was going to kill
him when he got to the bridge.  He told me he had nothing to
regret.  He said he had mistreated his sister, and he had nothing
to regret.  He said he had beat her up, that is the substance of
it; he said he had beat up his sister, and he had nothing to regret.
He never made any more explanation than I told you; he just
said he beat up his sister and treated her wrong."  The sheriff
testified to similar statements made to him.  In his statement
before the jury the defendant said, in part: "So from there we
went on to Line creek.  If there was anything said regarding
harming the boy, I don't know it.  When we got down there Pa
and them got out and this boy he got out also.  So Pa he says,
'Lay down, boy, lay down.'  He tied a rope around his legs and
he started to shoot him.  He says, 'Well, I am going to kill him,
boy.'  I commenced begging my father not to kill him, because
I knew that would get us into trouble if he killed him.  I knowed
we would get into trouble.  Pa was heat up about the way the boy
treated my sister; he had beaten her up; he says 'I am going to
end my troubles between him and I.'  I says, 'Pa, don't shoot him.'
I thought may be it would be a chance to throw him in the creek
and the boy swim out.  He says, 'Well we will whip him.'  I says

if you are going to do anything, that would be the best thing to do. He says, 'We will just whip him.' So we tied him. He asked the boy, 'You remember beating my daughter with the bed slat, don't you?' He says, 'Yes, I remember it,' and he says, 'I am not sorry that I done it.' He says, 'All right, what I do to you I am not going to be sorry for.' So he tied him and was going to throw him in the creek. He also pulled the gun out again. I told him, 'Pa, let's don't shoot him, let's go ahead and whip him; if you are going to do anything at all go ahead and whip him.' I says, 'Because you know if you kill the boy it will get us all into trouble.' He was mad on account of the way the boy treated my sister, and he says, 'I won't let him off no way.' So he got him tied, and I seen that he didn't tie him good, and I thought may be he might stand a chance to get out of the water. He tied his hands just around like that [indicating], just wrapped it around the rock, and the rock could have been very easily slipped out and his hands could slip out easy. Jeff he pulled one hand out, he had one hand out. The boy threw up his hand like that, and Pa grabbed his hand and wrapped the rope around it again. Jeff kinder loosed the rope up, and he says, 'Pa, I believe if you will turn him loose now he will go on and won't get us into any more trouble. I believe he would leave the country.' Pa says, 'I know he is going to leave,' and just shoved him around that way and I kinder lifted him up a little bit. Then we could hear him swimming down the creek a right smart piece; sounded like he was swimming. I couldn't see his body. Floyd went down on one side and Pa went down on one side, and me and Jeff went down with Floyd, and Jeff went back over there and says, 'I've got to get Pa away from here.' He went down on the other side. He wan't gone long, and I thought he would tell Pa to come on and let's go. Jeff come on back across the bridge. I didn't know how far Leon was gone with the car. After awhile they come back again, I guess about three or four minutes. They come back, and so me and Floyd and them up there in the road on the opposite side of the bridge, and they got in the car and come on up the road a little piece, and Pa he hadn't never come out yet. Jeff says, 'We better go back down and see what is the matter.' So he went back down there and kinder whistled and called, and Pa come walking on up, and we told him to come on lets go, 'that boy he is

done drowned.' Pa he come on up and got in the car and went up to my brother-in-law's, and got some oil and proceeded on back to Atlanta."

*J. S. Hall, George G. Finch,* and *A. Sidney Camp,* for plaintiff in error.

*George M. Napier, attorney-general, William Y. Atkinson, solicitor-general, T. R. Gress, assistant attorney-general, W. L. Stallings,* and *C. H. Arnall,* contra.

ATKINSON, J. 1. One ground of the motion for a new trial assigns error on an instruction by the court relating to confessions, on the ground that the evidence did not authorize a charge on that subject. A confession is a voluntary statement made by a person charged with the commission of a crime, wherein he acknowledges himself to be guilty of the offense charged. *Owens* v. *State,* 120 *Ga.* 296 (2) (48 S. E. 21). It will not suffice where only certain facts are admitted from which the jury may or may not infer guilt. *Covington* v. *State,* 79 *Ga.* 687 (7 S. E. 153) ; *Fletcher* v. *State,* 90 *Ga.* 468 (17 S. E. 100). But if the defendant admits the killing and states reasons moving him to commit the homicide, and the reasons given are insufficient to furnish any lawful justification or mitigation, the statements amount to a confession. *Jones* v. *State,* 130 *Ga.* 274 (4) (60 S. E. 840). The testimony as to admissions in this case was sufficient to show a confession. They were made "concerning the death" of the person slain after the defendant was charged with the crime. They were in substance that the defendant was one of several principals who actually killed the person by drowning him, and that the reason for the crime was a beating administered by the person to the sister of the accused at some indefinite time in the past, the circumstances and extent of which were not fully disclosed. *Nail* v. *State,* 142 *Ga.* 595 (3) (83 S. E. 226) ; *Thompson* v. *State,* 147 *Ga.* 745 (2) (95 S. E. 292). In *Lucas* v. *State,* 146 *Ga.* 315 (9) (91 S. E. 72), the writer of this opinion dissented from the opinion of the majority as to the sufficiency of the evidence to show a confession, on the ground that it did not appear that at the time the accused made the incriminatory statements he knew the victim of the tragedy was dead. That is not the fact in this case. The case also differs from *Boston* v. *State,* 94 *Ga.* 590 (20 S. E. 98, 21 S. E. 603), in which the defendant was present when the homicide was

committed, but did not take any part in the commission of the crime.

2. In other grounds of the motion for a new trial complaint was made of the following charge: "One material allegation of the indictment which the State must prove beyond a reasonable doubt is that the crime alleged in the indictment was committed in Coweta County. The law is," then follows the substance of Penal Code (1910) § 23, the exact language of which follows: "Whenever a stream of water is the boundary of a county, the jurisdiction of the county shall extend to the center of the main channel of such stream; and if an offense is committed on such stream, and the evidence on the trial does not definitely disclose in which county it was committed, the courts of either county may maintain jurisdiction for the trial and punishment of the offender." Error was assigned upon the charge, on the ground that it relieved the State of the burden of proving the venue. In connection with that assignment of error it was alleged that the above-quoted section is void as violative of article 6, section 16, paragraph 6, of the constitution of this State (Civil Code of 1910, § 6543). This provision of the constitution declares in part that "all criminal cases shall be tried in the county where the crime was committed, except cases in the superior courts where the judge is satisfied that an impartial jury cannot be obtained in such county." The charge was inapt, but these grounds of the motion for a new trial show no cause for reversal under the facts of the case.

The statutes creating them make the eastern bank of "Line Creek" the boundary line between the counties of Coweta and Fayette. Fayette County was created first in point of time, by the act of 1821 (Acts 1821, Extra Session, p. 3). That county was carved out of territory ceded to the United States for the use of Georgia by the Creek Nation of Indians, in a treaty concluded at the Indian Spring on the 8th day of January, 1821. The land so acquired was all of the land of the Creek Nation of Indians "east of" the "east bank" of Flint River. The words of the treaty descriptive of the land, so far as necessary to be stated, were "all that tract or parcel of land, situate, lying, and being east of the following bounds and limits, viz.: Beginning on the east bank of the Flint River, . . running thence, up the eastern bank of the same, along the water's edge, to the head of the principal west-

ern branch; from thence, the nearest and a direct line, to the Chatahoochie River, up the eastern bank of the said river along the water's edge, to the Shallow Ford, where the present boundary line between the State of Georgia and the Creek Nation touches the said river." 39 Senate Documents, 195, 58th Congress, 2d Session. The act of 1821, supra, creating the County of Fayette, declared: "That the territory acquired of the Creek Nation of Indians by the United States, for the use of Georgia, as described in articles of a treaty entered into and concluded between commissioners on the part of the United States, and the chiefs, headmen, and warriors of the Creek Nation of Indians, at the Indian Spring, on the eighth day of January, eighteen hundred and twenty-one, shall form and be divided into five counties, as follows, to wit:" Then follows designation of separate sections of territory to comprise the respective counties of Dooly, Houston, and Monroe, after which follows: "All that part of said territory which lies west of the last-mentioned line and a line commencing at the corner of Monroe County, as above described, and running north to the Chatahoochie, shall form one other county to be called Fayette." The act and the treaty considered together defined the boundaries of Fayette County. The west boundary of that county extended along the east bank of the Flint River up to the head of its principal western branch. The descriptive words in the treaty, "beginning on the east bank of Flint River, . . running thence up the eastern bank of the same, along the water's edge, to the head of the principal western branch," show the east bank to be the county line as distinguished from the stream as a boundary of the county. 9 C. J. 193, § 78; *Jasper County* v. *Butts County,* 142 *Ga.* 576 (83 S. E. 217). See also *Georgia Railway & Power Co.* v. *Wright,* 146 *Ga.* 29 (90 S. E. 465). After Fayette County was thus created another treaty was entered into between the Creek Nation of Indians and the United States, ceding for the use of Georgia lands which adjoin and lie immediately west of those ceded in the treaty mentioned above. This treaty was entered into on January 24, 1826, and, so far as necessary for a decision of this case, provided: "The Creek Nation of Indians cede to the United States all the land belonging to the said nation in the State of Georgia, and lying on the east side of the middle of the Chatahoochie River." 39 Senate Documents, 264,

58th Congress, 2d Session. The territory thus ceded extended as far eastwardly as the east bank of the Flint River up to the head of its principal western branch (the line specified in the other treaty). Coweta County was carved out of the territory ceded by this treaty. The act creating the county provided: "That all that part of the territory lately acquired from the Creek Indians, lying between the Flint and Chattahoochee Rivers, immediately above the old line of Early County, and known as the first section, shall form one county to be called Lee." Then follows designation of separate sections of territory to comprise the counties of Muscogee and Troup, after which follows: "That all that part of said territory east of the Chattahoochee and known as the fourth or upper section shall form one county to be called Cowetaw." Ga. Laws 1826, p. 57. This act, considered in connection with the provisions of the treaty to which it referred, gave to the County of Coweta all the territory north of Troup County extending from the middle of the Chattahoochee River eastwardly to the eastern limit of the Indian possessions, which was the east bank "of the principal western branch" of Flint River now called "Line Creek." The stream was called "Line Creek" in the act creating Campbell County (Acts 1828, p. 56). The boundaries and limits of counties created by statute are to be "ascertained by the several acts laying off the same, and those amendatory thereof." Civil Code (1910), § 31. Consequently the whole of the bed of the stream "of the principal western branch" of Flint River or "Line Creek" was included in Coweta County. The establishment of Campbell County, by the act approved December 20th, 1828 (Acts 1828, p. 56), and Heard County, by an act approved December 22, 1830 (Acts 1830, p. 48), so as to include certain of the northern and western territory of Coweta County, has worked a change in the original Coweta lines on the north and west; so also some changes of the line on the south have been made; but its original east line as above indicated has remained intact. There has been no specific act of the legislature changing that original line, and § 32 of the Civil Code, declaring that: "Whenever a stream of water is the boundary of a county, the jurisdiction of the county shall extend to the center of the main channel of such stream," did not change the line. *Jasper County* v. *Butts County,* supra. The act creating the County of Campbell, supra, seems to have regarded Line

Creek instead of the east bank thereof as the boundary line between the counties of Coweta and Fayette; but even if that was a legislative interpretation of the former acts creating the counties of Coweta and Fayette, it did not change the prior statutes fixing the line between those two counties, certainly not that part of them which was not put in the new County of Campbell. As the whole body of the stream of "Line Creek" on the east side of Coweta County as now existing is in Coweta County, it necessarily follows that offenses committed on that portion of the stream are committed in Coweta County. Whether on one side or the other of the main channel of the stream is immaterial on a question of venue for trial of the offenses. All of the evidence and the defendant's statement before the jury showed that the crime was committed on the portion of "Line Creek" that extends between the present north and south lines of Coweta County; and therefore a finding that the offense was committed in that county was demanded. Under the laws and constitution of this State, the venue for trial of criminal offenses is in the county where the crime was committed. Civil Code (1910), § 6543; Penal Code (1910), § 29. The provisions of § 23 of the Penal Code, relating to venue of offenses committed on a stream that is the boundary between two counties, were inapplicable to the case; but it is obvious that any error in giving that provision of the code in charge to the jury must be harmless. In this view it becomes unnecessary to decide the question as to the constitutionality of the statute last mentioned. It is a rule that "A court will always abstain from passing upon the question of the constitutionality of an act of the legislature, if there be any other ground in the case upon which to rest its decision." *McGill* v. *Osborne,* 131 *Ga.* 541 (2) (62 S. E. 811), and cit.

3. Another ground of the motion for a new trial complains of the omission of the judge, without request, to charge the law relating to involuntary manslaughter in the commission of an unlawful act. In the ground of the motion for a new trial it was insisted that the evidence introduced by the State authorized a charge on the subject; also that certain excerpts from the report of the statement by the defendant before the jury authorized a charge on the subject. If a charge on the subject had been desired on the basis of the defendant's statement before the jury

and the statement would have authorized it, an appropriate written request should have been made. The pertinent portions of all the evidence bearing on this subject are set out in the statement of facts, and it is sufficient to add that it does not appear that the law of involuntary manslaughter was involved.

4. The ruling announced in the fourth headnote does not require elaboration.

*Judgment affirmed. All the Justices concur.*