## MORRIS *v.* THE STATE.

No. 9051.  JANUARY 14, 1933.

*Branch & Howard, Stonewall H. Dyer,* and *Marshall & Gilbert,* for plaintiff in error.

*Lawrence S. Camp, attorney-general, John A. Boykin, solicitor-general, T. R. Gress, assistant attorney-general, J. W. LeCraw,* and *E. A. Stephens,* contra.

BELL, J.  W. T. Morris was convicted of the murder of J. W. Barfield by shooting him with a pistol, and was sentenced to life imprisonment.  His motion for a new trial was overruled, and he excepted.

The defendant and the deceased were members of the police force of the City of Atlanta, and the deceased, a lieutenant, was the defendant's next superior officer.  The evidence showed that at the time of the homicide the defendant and the deceased were riding togther in an automobile along Peachtree Street in Atlanta.  They were going in a southerly direction, and the deceased was driving the automobile.  No one actually saw the firing of the pistol, but several witnesses heard the report, and, upon looking in the direction from which the report came, saw the deceased as he slumped over the steering-wheel of the vehicle, which was then about to stop, and which presently did stop at a point near the curb.  Several persons went immediately to the car and found the defendant Morris and Lieutenant Barfield both sitting in the front seat, the

defendant apparently in a dazed condition and Barfield helpless and unconscious from a pistol-shot wound in his forehead. A physician who performed an autopsy testified that the bullet entered the head of the deceased a little above the right eye and ranged through the brain slightly downward. The evidence showed that the defendant had to be urged before he got out of the car; and that when he raised up, a pistol fell out of his lap. The pistol was smoking and showed that one of the cartridges had been recently fired. Upon being questioned at the scene of the homicide the defendant stated, in effect, that some person in another automobile, which he described as a green roadster, had fired the shot which killed Lieutenant Barfield, and that he shot his own pistol at the slayer; and he repeated this explanation on several later occasions. Numerous witnesses testified that only one shot was fired, and that no such car as was described by the defendant had passed at that time. One witness, a woman who was traveling in the vicinity, testified that instantly after the shot was fired she looked and saw Lieutenant Barfield holding the steering-wheel with both hands in a driving position.

The defendant made an entirely different explanation of the affair in his statement at the trial, claiming that the pistol was discharged in a struggle for its possession between him and Lieutenant Barfield when the latter demanded the defendant's gun and badge for some reason unknown to the defendant. A more complete reference to this final contention of the defendant will be made presently. The defendant had been a member of the police force of the City of Atlanta for about 29 years. For some time he had been assigned to a patrol in the neighborhood of Peachtree and Tenth Streets. The State contended that he was intoxicated while on duty on the morning of the homicide, and that Barfield, having learned of this fact, had removed him from his beat and was taking him to police headquarters, as it was Barfield's duty to do. The State further contended that the defendant shot and killed the deceased because of his resentment of this action on the part of Barfield, and that he was still intoxicated at the time of the homicide. The evidence for the State authorized a finding in favor of each and all of these contentions by the State. The evidence showed that another member of the police force, a short while before the homicide, warned the defendant in a friendly way "that somebody was liable to call up and report him for being drunk," that "they [the

police officials] were awful tight," and that the defendant replied, "If any of them come out here after me, I will fill them full of holes." The defendant, on the other hand, contended and introduced various witnesses to show that he was not intoxicated upon the occasion in question, but was sick; and under the rule that the jurors are the exclusive arbiters of the facts, they could have accepted this theory in preference to that of the State.

In support of its contention as to the defendant's intoxication the State was allowed, over objection, to show that the defendant had been intoxicated on numerous previous occasions, and to prove other facts tending to show that the defendant was addicted to drink. The admission of this evidence is complained of in the motion for a new trial. Error was also assigned upon certain excerpts from the charge of the court, and in three of the grounds of the motion for a new trial it was contended that the court erred in refusing timely written requests to instruct the jury upon the law relating to the offenses of manslaughter both voluntary and involuntary. The remaining portion of this statement is intended mainly to illustrate the rulings of the court upon these requests to charge.

Upon the trial the defendant stated to the court and jury that on the day before the homicide he was very hot and sick, and that Lieutenant Barfield, on coming by his beat as usual, noticed that he was sick, and relieved him from duty for a time, while the defendant sat in the lieutenant's car; and that afterwards the lieutenant came and got in the car, where for some time they sat and talked to each other. As to what occurred on the morning of the homicide, the defendant made the following statement: Lieutenant Barfield "knew that I had been sick, and he asked me in a very nice way how I was feeling, and [I] told him. Well, Lieutenant Barfield was a man that has always treated me all right. I have always been his friend, and he has been my friend. He came on down to his car, and I went with him, and we got in the car. He asked me to get in, and the first word he said about getting in was 'get in and let's take a ride.' We had been together several minutes before we got in the car. We got in the car and drove up Peachtree to Eighth Street and around on my beat and came down by Columbia Avenue and back to Peachtree Place, and then he turned in the direction coming toward town. Well, coming toward Sixth Street,

we passed Sixth Street and were approaching Fifth Street, and Lieutenant Barfield said to me, 'Brother Morris, I want your gun and badge,' and he reached over and pulled it out of my scabbard; and as he did, when he pulled it out, I grabbed it and I said, 'Lieutenant, what do you mean, explain yourself.' Well, he never said a word, and just threw his hand up this way and down that way, and both of our hands went to the top of the car, and the pistol fired, and when it did he just slumped over. When the gun fired, we both seemed to release it at once and it dropped down, and when I noticed he was slumping over and I saw the lieutenant was shot, it just paralyzed me—it was so horrible—I could not move —I could not do a thing. . . This accident is nothing more nor less than an unfortunate, horrible affair."

One of the witnesses for the State testified as follows, as to rules of the police department: "In the event a patrolman is taken in charge by a superior officer, it has been the custom and rule of the police department to bring him to headquarters and let the chief determine as to stripping him of his badge and equipment, and in his absence the captain of the watch on duty. It has been the custom, when an officer is taken in charge on a charge of drunkenness, to disarm him."

■ In one of the grounds of the motion for a new trial it was complained that the court erred in charging the jury upon the subject of admissions, because there was no evidence upon which to base the charge. It was in evidence that at the scene of the homicide the defendant stated that the pistol found in the car was his pistol, and that he had shot it on the occasion in question, claiming, however, that he had fired the pistol at a man who was passing in a green roadster. Accordingly, the evidence authorized a charge upon the subject of admissions. "An admission, as applied to a criminal case, is the statement by the defendant of a fact or facts pertinent to the issues and tending, in connection with proof of other facts or circumstances, to prove the guilt of the accused, but which is of itself insufficient to authorize conviction." *Ransom* v. *State, 2 Ga. App.* 826 (2) (59 S. E. 101). See also *Turner* v. *State,* 138 Ga. 808 (76 S. E. 349).

■ The court instructed the jury in the language of section 1010 of the Penal Code, as to the degree of proof necessary to sustain a conviction on circumstantial evidence, and then added: "In

other words, where circumstantial evidence alone is relied upon for conviction, if there be any reasonable conclusion consistent with the innocence of the defendant to be drawn from such testimony, it would be the duty of the jury to give the defendant the benefit of such conclusion, and acquit." The quoted excerpt was assigned as error upon the ground that it instructed the jury in effect "that in order for an acquittal to result in a case where circumstantial evidence is relied upon the jury would have to find a theory or hypothesis consistent with innocence based upon the testimony in the case; whereas, as movant contends, the true law is that the evidence must be sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, and that the conclusion or theory consistent with innocence does not have to be drawn from the evidence or testimony in the case, but must be drawn unless the evidence in the case is sufficient to exclude the hypothesis of innocence." Section 1010 of the Penal Code is as follows: "To warrant a conviction on circumstantial evidence, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused." This section is not of statutory origin, but is a codification of the principles ruled in certain decisions by this court. *Simmons* v. *State,* 85 *Ga.* 224 (11 S. E. 555), and cit. A majority of this court are of the opinion that the meaning of this section is so clear and manifest as not to require explanation, and therefore that the attempt as made in that direction in the present case was at least futile and unnecessary, if not actually a restriction upon the meaning of the statement contained in the Code. But since a reversal must be ordered upon other grounds as indicated in the fourth division of this opinion, no decision is made as to whether the charge excepted to constituted reversible error. Upon this question the views of Gilbert and Bell, JJ., are as follows: The charge complained of was the equivalent of stating that if the evidence was such as to leave open any reasonable theory of innocence, the defendant should be acquitted; and as thus construed the excerpt was a correct statement of the rule as to circumstantial evidence, and was not subject to the criticism made of it. See, in this connection, *Thompson* v. *State,* 166 *Ga.* 512 (12) (143 S. E. 896); *Yaughan* v. *State,* 148 *Ga.* 517 (97 S. E. 540); *Wilburn* v. *State,* 141 *Ga.* 510 (7) (81 S. E. 444); *Cargile* v. *State,* 136 *Ga.*

55 (2) (70 S. E. 873); *Sellers* v. *State,* 36 *Ga. App.* 653 (137 S. E. 912).

■ Several grounds of the motion for a new trial will now be considered together. The court admitted, over objection, the testimony of a witness for the State to the effect that on Thursday of the week before the homicide the defendant while on duty stated to the witness that he had had some teeth extracted and was feeling badly, and that if he had a "good, stiff drink," he would feel better. The witness stated that he agreed with the defendant provided the whisky "had quinine in it," and that the defendant replied that he "was not particular about the quinine." This evidence was objected to upon the ground that it related "to something that happened a week before," and "was entirely irrelevant." The solicitor-general propounded to Chief of Police James L. Beavers the following question: "Chief, what had been Mr. Morris's habits with reference to drinking whisky, prior to this alleged homicide?" to which question the witness answered: "Well, he would take spells of drinking once in a while. I don't remember just how often. I think I had occasion to bring charges against him a time or two while he was in the office as my secretary. I don't remember just when the last time was that I saw him under the influence of liquor prior to this occurrence. It was some time before. I don't remember the exact date." This testimony was objected to upon the ground "that the same was not relevant and was not in rebuttal of anything that had been shown by the defendant, and was an effort to prejudice the defendant's case by trying to put his character and habits in issue. The court overruled the objections and refused to exclude the testimony. Other evidence elicited from the same witness, over objection, was as follows: "The defendant was demoted from secretary to the chief. The cause of his being demoted from secretary to a patrolman was drinking whisky." The objection was the same as last stated above.

The court also admitted, over objection, an extract from a minute-book of the board of police commissioners of the City of Atlanta, showing that in December, 1919, the chief had preferred against the defendant charges of "drinking and being under the influence of whisky while on duty," and of being "disrespectful to his superior officer," and that the defendant pleaded guilty and was suspended for three days, after which he was to be allowed to re-

turn to work and be paid for time lost. The defendant objected to this evidence upon the ground "that it was irrelevant to the issue on trial, and related to a transaction that occurred long before the time of the alleged homicide for which he was being tried, and that said evidence could not be relevant to the issue being tried, but could only have the effect of placing his character in issue and to prejudice the jury against him." The court further allowed in evidence, over objection, an extract from the minutes of the board of police commissioners, showing that the chief of police preferred similar charges against the defendant in December, 1924, and that the defendant entered a plea of guilty and was suspended for 25 days.

The court allowed a member of the police force to testify that he and the defendant worked together for something like 14 months, beginning about two years preceding the homicide and ending the Christmas next before it, and that during that time the defendant "was under the influence of something." The witness further testified: "I never could smell anything on his breath, but he was under the influence of something, and would get plumb out of the way at times. That happened right often. He was drunk. I could not tell you the number of times that that occurred, but it was a good deal of the time that I was with him. It was frequent. That was when he was on duty, discharging, or attempting to discharge, the functions of a policeman. The last day I worked with him he was drunk. That was Christmas day last year—last Christmas day. At times when he would be drinking, I would talk with him about it. He never did seem to pay any attention to what I said. The subject has come up between us about him being taken in off his beat. When he was under the influence of whatever it was, I could not smell any whisky on him, but I know what a drunk man is, having handled them for several years." All of this evidence was objected to by the defendant upon substantially the same grounds as stated above. The court allowed a witness to testify "that the defendant, while filling the position of secretary to the chief of police, would go to the storage-room of which the witness had charge, and would sometimes ask the witness for some of the whisky which was stored in said room." The court overruled the same objection to this evidence.

There was no error in admitting any of this evidence over the

objections presented. The case involved the material questions whether the defendant was intoxicated while on duty on the morning of the homicide, and whether his superior officer, the deceased, was removing him from his beat and escorting him to the police station on a charge of that nature. The evidence as to his previous conduct in relation to the use of whisky tended to establish the habit of intoxication, and, when considered with the other evidence, constituted links in a chain of circumstances from which the jury could infer that the defendant shot and killed the deceased, partly because of a dulled and intoxicated mind, and partly in revenge for the action of the deceased as just indicated. The other transactions referred to were connected in a material way with the offense for which the defendant was being tried; and the evidence relating thereto, being relevant to important issues under investigation, was not inadmissible merely because it may have tended to show the accused guilty of other offenses or to impugn his character. See, in this connection, *Peek* v. *State,* 155 *Ga.* 49 (3) (116 S. E. 629); *Manchester* v. *State,* 171 *Ga.* 121 (6) (155 S. E. 11); *Lucas* v. *State,* 146 *Ga.* 315 (5) (91 S. E. 72); *Frank* v. *State,* 141 *Ga.* 243 (2 *b*) (80 S. E. 1016); *Wilson* v. *State,* 173 *Ga.* 275 (2) (160 S. E. 319); *Taylor* v. *State,* 174 *Ga.* 52 (7) (162 S. E. 504); *Enright* v. *Atlanta,* 78 *Ga.* 288.

In one of the grounds of the motion for a new trial error is assigned upon the refusal of a timely written request to charge the law of voluntary manslaughter, as contained in the Penal Code, §§ 64, 65, the language of which was set forth in the request. In other grounds error is assigned upon the refusal of like requests to instruct the jury upon the law relating to the offenses of involuntary manslaughter both in the commission of an unlawful act and in the commission of a lawful act in an unlawful manner, as defined in the Penal Code, § 67, the language of which was stated in the requests. In the grounds here under consideration, the movant set forth the various contentions of the parties as made by the evidence and the defendant's statement, the purpose being to demonstrate that the offenses of voluntary and involuntary manslaughter were involved, and that the requested charges were pertinent. We can not agree with the contention made by counsel for the State that either the requests or the assignments of error on the refusal thereof were deficient in any particular; and so the question is, did

the court err in failing to instruct the jury as requested? See, in this connection, *Hanye* v. *State,* 99 *Ga.* 212 (3) (25 S. E. 307); *Price* v. *State,* 137 *Ga.* 71 (7) (72 S. E. 908). The law declares that the defendant's statement shall have such force as the jury may think right to give to it, and that they may believe it in preference to the sworn testimony in the case. The fact that the defendant had repeatedly given a different version of the homicide did not absolutely compel the jury to disbelieve the statement which he made upon the trial. It was the province of the jury to believe all or none of the statement, or to believe a part and reject a part, and in like manner they could believe a part of the testimony and reject a part. *Phillips* v. *State,* 26 *Ga. App.* 263 (105 S. E. 823). The defendant stated that he had been guilty of no misconduct, and it was a possible inference from his statement that the deceased reached for the defendant's pistol, not only without notice, but also without justification and for some reason wholly unknown to the defendant. Taking a part of the State's evidence and a part of the defendant's statement, the jury could have found that the defendant then shot and killed the deceased even during a struggle for the pistol. The defendant further stated that he demanded an explanation of the deceased, and that a struggle ensued in which the pistol was discharged. By taking a part of the evidence for the State and a part of the defendant's statement, the jury, if the question had been submitted to them, might have found that the conduct of the deceased was such as to justify the excitement of passion and to exclude all idea of deliberation and malice on the part of the defendant; and that although the killing was intentional, it was not done under such circumstances as to constitute the offense of murder. Accordingly, the court should have charged the jury upon the law of voluntary manslaughter, as requested by the defendant. *Drane* v. *State,* 147 *Ga.* 212 (93 S. E. 217).

If the defendant was intoxicated, as contended, and if the deceased was escorting him from his beat and to police headquarters on a charge of being drunk while on duty, and if in compliance with the rule as to disarming such an officer the deceased reached for the defendant's pistol, as contended by the latter, the defendant was engaged in an unlawful act amounting to an assault or to an assault and battery when he attempted to wrest the pistol from the hand of the deceased, and if in the struggle that followed the pis-

tol was accidentlly discharged as a result of the defendant's conduct, the jury would have been authorized to find the defendant guilty of involuntary manslaughter in the commission of an unlawful act. *Austin* v. *State,* 110 *Ga.* 748 (2) (36 S. E. 52, 78 Am. St. R. 134). If the jury had believed that the deceased attempted to take possession of the defendant's pistol when he was not justified in doing so, and that the defendant resisted this effort on the part of the deceased but failed to exercise the proper caution and circumspection and thereby unintentionally caused the pistol to be discharged and to kill the deceased, a verdict finding the defendant guilty of the offense of involuntary manslaughter in the commission of a lawful act without due caution and circumspection would have been authorized. *Burton* v. *State,* 92 *Ga.* 449 (17 S. E. 99). "Where there is evidence sufficient to raise a doubt, however slight, upon the question whether the homicide was murder or manslaughter, voluntary or involuntary, it is the duty of the court to charge on all these grades of homicide." *Freeman* v. *State,* 158 *Ga.* 369 (2 *a*) (123 S. E. 126). Under the principles ruled in that case as applied to the evidence and the defendant's statement in the case at bar, there is no escape from the conclusion that the learned judge of the trial court committed error in refusing the requests to charge the jury upon the law relating to voluntary manslaughter, and to both grades of involuntary manslaughter, as requested by the defendant. See also, in this connection, *Boyd* v. *State,* 136 *Ga.* 340 (2) (71 S. E. 416).

*Judgment reversed. All the Justices concur.*