## MARTIN v. THE STATE.

No. 13983. April 14, 1942. Rehearing denied May 20, 1942.

*James R. Venable, F. Joe Turner, Frank Grizzard,* and *Frank A. Bowers,* for plaintiff in error.

*Ellis G. Arnall, attorney-general, Roy Leathers, solicitor-general,* and *E. J. Clower, assistant attorney-general,* contra.

Reid, Chief Justice. The claims of error in this case, where the defendant was convicted and sentenced to be electrocuted for the murder of his wife, in addition to the general grounds of the motion for new trial relate to the charge of the court and to the question (made in a special ground of his motion for new trial) whether the venue of the crime was sufficiently shown. The facts about the homicide, as shown by the defendant's statement and from evidence offered by a number of witnesses testifying both for the State and for the defendant, are not really in substantial conflict as regards the main events to be considered. No one saw the actual homicide, and since the defendant in his statement does not admit the actual killing, support for the verdict of guilty must be found entirely through circumstances. The case as thus presented may be stated substantially as follows:

The defendant had been separated from his wife for several months before the time of the crime. She was living with her family on Wade Avenue in DeKalb County, and was employed at some place in Atlanta. During the period of separation the defendant had sought in various ways to induce her to come back and live with him. He had conceived the idea that her father was largely responsible for their separation, had made threats against

her father, and on one occasion had a physical altercation with him. There was some contention also that he had made threats against his wife, but most of the evidence showed solicitude for her and great desire on his part for a reconciliation. In these efforts he had been so persistent that she had sought protection by swearing out a peace warrant for him, and had taken some other legal proceedings which are not clearly shown in the record. At the time of the homicide the defendant was employed as soda clerk for a drug-store in Atlanta, and on the morning before the crime occurred in the early evening (shortly after dark) he, together with a man named Fischer, who was employed at the same drug-store, began drinking, and during the morning ordered a half-gallon of corn whisky which they continued to drink. They left their place of work shortly before two o'clock, and began riding around in an automobile, going later in the afternoon to the home of a relative of the defendant, where Martin discussed his marital difficulties. From there they went to a grocery store, where Martin inquired of the proprietor as to where his wife and her family lived (they having moved to a new address about which Martin was not certain). A short time later they appeared at a filling-station about three doors from where the defendant's wife worked, where they parked and waited for some time, during which it was claimed Martin tried to reach his wife by telephone. From there they drove to a point where the defendant's wife boarded a street-car. They followed the street-car for some distance, and the defendant asked Fischer to get on the street-car and get off the car when his wife got off, Martin continuing to follow the street-car in his automobile. The wife and Fischer got off the car at Wade Avenue in DeKalb County, where the defendant sat waiting in his parked automobile. Martin asked Fischer to drive his car up the block and wait for him, and Martin there joined his wife. What happened then is not known, except from the defendant's statement and from what is to be deduced from circumstances immediately following. Fischer, who parked his car about a half block from where Martin joined his wife within about two minutes, testified as to this event: "I got off when she got off. I believe it was Wade Avenue when I got off. It was in DeKalb County at Wade Avenue. When I got off at the corner of Wade Avenue, following his wife, as I got off the car, he was parked there, and he jumped off the car, out of

the automobile, I mean, and says drive on up a block, said I'm going to try to get my wife to go back with me, and if she does I will carry her home. . . After I drove this short distance away, I pulled up, and just as I parked the car . . it may have been a minute or two after I parked the car . . I heard screams. It sounded like a child getting whipped. . . When I went back I found either a child or a small lady. I thought it was a child when I first got there. She [the deceased] was in the middle of the street. I don't know. the name of the street. As to what county it was in, it must have been in DeKalb County. She·was very bloody, all over the face. . . I found the body in the middle of the street. . I heard the scream, and left the car and found the body in the middle of the street."

The defendant in his statement as to the events transpiring on that day conformed substantially to what has been stated above, and as to what happened when he met his wife at Wade Avenue he said: "I got there and spoke to my wife. We were standing there talking and discussing first one thing and then another, and I kissed my wife, and then she made a remark about smelling the odor of whisky on my breath. I told her yes, that I had been drinking, and I don't remember all the conversation, just part of it that I do remember. I asked her if she had gone to an attorney other than the one she talked to. She said no, she didn't care anything about a divorce; and I think I told her I was leaving for the army, I am not sure. Well, some one come down the street while we were standing there talking. I don't know who it was. And then, about that time I think Mr. Fischer cranked the car up and drove up the street. Where he went, I don't know. And she asked me who was in the car that brought me out there. I told her a Mr. Fischer, the manager of the drug-store where I had been employed. She asked me if I intended to try to get her to go back with me or try to get her in the car. I told her no, she was true. And she and I turned, we were standing there, I had my, I believe, my left arm around her, and we turned and started walking back down the street. How far back down the street we went, I don't know, or if we crossed the street, I don't remember. I remember my wife, I don't know for sure, it seems like my wife was, well, I will say in a crouching, you know, I don't know whether she was down, or stooping down, or what, but anyway it seems to me like

that is the position. I won't say for sure, because I am not sure in what position. I won't say for sure, because I am not positive about it, or when I left there, or what our last words were, I don't know. The next thing that I remember half way clearly was I went to Mrs. Ledbetter's, and I don't know what kind of conversation we had. I remember going there. How long I stayed there I haven't the slightest idea. I left there sometime that night, I imagine, I don't know. The next thing I remember clearly I was up town. It must have been the next day after that, or the next day, following day. I bought a paper, and I noticed in there my picture, where the police was after me for the slaying of my wife."

Other witnesses were near the scene of the homicide at the time it occurred, and testified as to what they saw and observed. One witness, observing "something wrong with her," saw Mrs. Martin near the corner of Wade Avenue and Woodbine Avenue, and testified as follows: "She (deceased) turned towards me, threw up her hands, and fell back. . . I think she realized help had come to her, and she just gave up. . . She turned and looked at me, and threw up her hands and fell. . . As to the condition of the dirt and pavement in the immediate vicinity, well, it looked like there had been a scuffle, and there was a pool of blood there, looked like there had been a scuffle where her hat, pocket-book and all lay." An officer called to the place of the homicide testified as follows: "When we arrived, . . Mrs. Martin was lying in the street; she was lying face upward. Her hands were stretched out by her side. There was a wound in her throat. She had considerable blood on her. There was blood on her hands. A doctor from Grady Hospital was present, and he pronounced her dead shortly after we arrived." Various people gathered immediately around the place, and a number of them testified in substantial conformity to what is here shown. About the time Mrs. Martin fell in the street, some one went for Fischer, who was found in the parked car and who appeared to be asleep. He was roused up, and came down to the place as appears from his testimony quoted above. The evidence shows that in some way Mrs. Martin had received a number of wounds (one witness testified to thirteen in number) apparently inflicted by a knife or sharp instrument, as charged in the indictment. At the trial the undertaker identified her clothes and a picture of her body showing various wounds. After she fell to the

street her body was found lying face upward, with a wound in the throat cutting her windpipe; and she seems to have died immediately, since all of the events were represented to have occurred in a very brief time. Under the record, the defendant Martin was last seen by Fischer when he appeared at the Ledbetter home about eight o'clock that night. He had previously known the Ledbetters, and went to the back door of their home. Miss Ledbetter testified: "He told me to shut the door, because the police were after him; and I shut it. . . He had blood on his hands. He pointed to it one time, and said it was Dorothy's blood. . . He was awfully nervous. He had been running or something. He was out of breath. As to what he said about Dorothy, he wouldn't say much at first. He said she was probably dying at that moment. He asked us if we thought they would put bloodhounds after him. He was terribly worried. He heard some dogs barking in the distance, and he called me in the front room to see if I didn't think they sounded like bloodhounds." After requesting the Ledbetters not to tell any one he had been there, Martin left, and was not discovered until two or three days later when he was recognized on the military reservation at Fort McPherson. He was there taken into custody. In statements which he later made to police officers, nothing was said by him substantially different from what is stated above. His main contention was that he did not remember anything that took place after the conversation with his wife (at the place of the homicide) until he was at the Ledbetters' home. About fifty yards away was found a knife identified, both by Martin in his statement to the police officers and others, as being one owned by him. One witness testified that some time before the homicide Martin exhibited this knife and said that some one's name was written on it. A number of acquaintances testified as to his being extremely nervous during the several weeks preceding the homicide, and as to various conversations indicating strange behavior and an obsession with reference to his wife's separation from him. Some of them thought he was of sound mind and knew the difference between right and wrong; some emphasized extreme despondency exhibited in his conversations in which he spoke of means of killing or injuring himself; all being offered for the purpose of showing insanity.

In ground 1 of the amendment to the motion for new trial it is contended that the court erred in the instructions given to the

jury on the effect to be given to circumstantial evidence. Complaint is made that the court erred in failing to instruct the jury that the State relied for conviction solely on circumstantial evidence; and that the jury should have been instructed that, before they would be authorized to convict, the proved circumstances must be consistent with the theory of the defendant's guilt, and must exclude every reasonable hypothesis save that of the guilt of the accused. It is also contended that the charge on circumstantial evidence was obscure and confusing, and that in connection with this charge the court should further have charged the provisions of the Code, § 38-105, relating to the degree of mental conviction required in criminal cases as distinguished from civil cases; and that the charge on reasonable doubt was confusing and argumentative.

The court, in the charge on the rules of evidence and in the same connection, gave the correct definition of direct evidence and of indirect or circumstantial evidence. It is contended, not that the charge as given did not state abstractly correct principles of law, but that the reference to direct evidence made it erroneous, since the court did not in so many words explain that the State relied only on circumstantial evidence. In *Owens* v. *State,* 139 *Ga.* 92 (supra), it was held: "Where the court defines direct and circumstantial evidence and gives an instruction, that, 'before the jury would be authorized to convict upon circumstantial evidence alone, the proven facts must not only be consistent with the hypothesis of the defendant's guilt, but should exclude every other reasonable hypothesis save that of the guilt of the accused,' the omission of the court to instruct in so many words that the defendant's guilt was sought to be established only by circumstantial evidence is not sufficient ground for new trial." In *Wilburn* v. *State,* 141 *Ga.* 510 (6), 512 (81 S. E. 444), it was held: "It was not cause for a new trial that the court, in defining circumstantial evidence and in instructing the jury as to the law on that subject, in the same connection gave to the jury the definition from the Code of 'sufficient evidence,' 'cumulative evidence,' 'direct evidence,' and 'presumptive evidence.'" See also *Lanier* v. *State,* 141 *Ga.* 17 (80 S. E. 5); *Moss* v. *State,* 43 *Ga. App.* 109 (158 S. E. 461). The court having correctly defined circumstantial evidence and instructed the jury on the degree of proof necessary to sustain a conviction on circumstantial evidence, it was not error to omit further charge

enlarging upon it or attempting an explanation of its meaning. See *Morris* v. *State,* 176 *Ga.* 243 (167 S. E. 509); *Howard* v. *State,* 45 *Ga. App.* 361 (164 S. E. 450). As to the contention that the full provisions of the Code, § 38-105, respecting the degree of mental conviction required in criminal cases, see *Fowler* v. *State,* 187 *Ga.* 406 (2) (1 S. E. 2d, 18), where it was pointed out that it is better practice in criminal cases to omit from the charge that portion of the section which contrasts the preponderance of evidence rule in civil cases with the rule obtaining in criminal cases. Supporting this principle also is *Hatcher* v. *State,* 176 *Ga.* 454 (168 S. E. 278), and cit., where it was likewise held not error to omit to give in charge this section of the Code. It is pointed out by the trial judge, in the order overruling motion for new trial, that the charge on reasonable doubt, complained of here as confusing and argumentative, was given in the language requested by the defendant's counsel. The criticism now made must be rejected. See *Coleman* v. *State,* 141 *Ga.* 731 (82 S. E. 228); *Fulford* v. *State,* 149 *Ga.* 162 (99 S. E. 303); *Melton* v. *State,* 186 *Ga.* 660 (198 S. E. 695).

■ The court, after stating to the jury, "Now, gentlemen, as to whether or not the question of drunkenness enters into this case, that is a question for you gentlemen to determine from the evidence, including the defendant's statement, you giving to it such weight and credit as you think it is entitled to receive," and after stating whether drunkenness was in the case was for them to determine, without any intimation from the court, proceeded to give in charge the principles of law to be applied "if you should find that there was any drunkenness in the case," but to be disregarded "if you should find that there was not." The court then gave in charge the principle of law that "voluntary drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, artifice, or contrivance of another person for the purpose of having a crime perpetrated," stating further: "In other words, gentlemen, under the law, voluntary drunkenness of itself is no defense or excuse for crime," and giving further elaboration of these principles. Error is assigned on the giving of this charge, on the grounds that it was not adjusted to the evidence and to the contentions of the parties; that it was repugnant to previous instructions given to the jury; and that it

was an incorrect statement of the principle of law, in that the court failed to instruct the jury that such voluntary drunkenness must have been brought on by the defendant with the view of committing such alleged offense; for otherwise the defendant or any one else, who might imbibe alcoholic drinks with one purpose or intention of becoming intoxicated or with no purpose or intention of committing any crime or violating any law, could under these instructions be guilty of exercising an intent, when in fact his mental faculties and reason would be dethroned.

It is complained in behalf of defendant, that at no time in the trial did he contend that "he was either voluntarily or involuntarily drunk, and advancing such drunken condition as an excuse" for the alleged crime. There was evidence that he had been drinking at various times during the few hours immediately preceding the crime; and in his statement to the jury he admitted having ordered half a gallon of liquor, admitted that he and the witness Fischer had been drinking during the day, and pointed out that at the time he saw his wife she complained of the odor of whisky on his breath. The judge in submitting this principle of law made it clear to the jury that it was to be applied by them only if they should find from the evidence that it played a part in the case. It was fairly presented, and was called for by the evidence. Nor do we discover any error in the charge itself as stating an incorrect or incomplete principle of law. "That voluntary drunkenness shall not be an excuse for crime is the written law of this State, and the sooner that it is recognized and observed the better it will be for all over whom it is to be enforced. One who voluntarily kills must meet the demands of justice and of law with some other excuse than that of drunkenness. In the language of Justice Bleckley, in *Marshall* v. *State,* 59 *Ga.* 154: 'To be too drunk to form the intent to kill, the slayer must be too drunk to form the intent to shoot.'" *Hanvey* v. *State,* 68 *Ga.* 612. "A person, sober enough to intend to shoot at another and actually to shoot at and hit him, without any provocation or justification whatever, is to be deemed sober enough to form the specific intent to murder; and mere drunkenness, whatever its degree, will not negative such intent." *Estes* v. *State,* 55 *Ga.* 30. In *Allen* v. *State,* 187 *Ga.* 178 (200 S. E. 109), the charge complained of was substantially the same as that here involved. It was held to be without error. The case of

*Hayden* v. *State,* 176 *Ga.* 304 (168 S. E. 272), contained likewise an assignment of error similar to the one here under consideration; and it was held to be without merit as an attack upon such a charge. *Cone* v. *State,* 193 *Ga.* 420 (18 S. E. 2d, 850).

Ground 3 presents the contention that the State failed to prove the cause of the death of Mrs. Martin, and failed to connect it with any criminal agency. Decision on this question in the instant case substantially determines the sufficiency of the evidence to support the verdict, as involved in the general grounds of the motion for new trial. While by no means including all of the details of proof and circumstances presented at the trial, we have set forth the facts of the case with some degree of fullness, so that a decision upon these questions can be better understood. Full reference to the statement of facts is therefore made in this division of the opinion. "Before there can be a lawful conviction of a crime, the corpus delicti, that is, that the crime charged has been committed by some one, must be proved beyond a reasonable doubt. *Shedd* v. *State,* 178 *Ga.* 653 (173 S. E. 847). In homicide cases it must be proved that the death was caused or accompanied by violence or other direct criminal agency of some other human being. *Langston* v. *State,* 151 *Ga.* 388 (106 S. E. 903). The first inquiry is, was the proof sufficient as to the corpus delicti? It may be shown by indirect as well as direct evidence. *Buckhanon* v. *State,* 151 *Ga.* 827 (108 S. E. 209), 1 Whart. Cr. Ev. (10th ed.) § 325 d; 26 Am. Jur. § 462." *Wrisper* v. *State,* 193 *Ga.* 157 (17 S. E. 2d, 714).

The defendant admitted following his wife to the place where she alighted from the street-car. He was alone with her for a brief period. She was seen immediately afterward to fall in the street. There were many wounds on her body and blood on her body and clothing, and on the street where she fell. One of the wounds slashed the throat to the windpipe, and she died almost immediately. There was no question as to her identity. The undertaker identified her clothing and a picture of the body. The knife of the defendant showing blood was found near by. She had been heard to scream shortly after she was alone with the defendant. The indictment charged that the killing was done "by stabbing, slashing, cutting, wounding, and killing her, the said Dorothy Bryant Martin, with a knife." The testimony of the undertaker

was that the wounds had been made by a sharp knife or sharp instrument. In *Thomas* v. *State,* 67 *Ga.* 460 (6), the ruling was that "A dead body found with a knife thrust across the throat and breast, sufficient to have caused death, and with no signs of accident or suicide about it, is sufficient to prove the corpus delicti of murder." In the opinion Chief Justice Jackson said: "The body in death and the criminal agency in causing it are the two elements that make the corpus delicti. The body found and identified, the throat cut, the fact that there was no sign of suicide or accident, are ample to prove the corpus delicti." On the sufficiency of the proof in the present case, see *Sligh* v. *State,* 171 *Ga.* 92 (3), 108 (154 S. E. 799); *Jester* v. *State,* 193 *Ga.* 202 (17 S. E. 2d, 736); *Wrisper* v. *State,* supra, and cit. We have reached the conclusion, from a careful study of the record, that there was sufficient proof to establish the corpus delicti. Accordingly, we hold this ground of the motion for new trial without merit.

■ Ground 4 makes the point that the venue of the crime was not sufficiently shown. "That an offense was committed within the limits of the county, when a court of that county has assumed jurisdiction to try a person charged with a crime, is a fact necessary to be proved in order to make a conviction legal. To sustain a conviction, such fact must be proved beyond a reasonable doubt. *Rooks* v. *State,* 65 *Ga.* 330; *Moye* v. *State,* Id. 754." *Jones* v. *State,* 113 *Ga.* 271 (38 S. E. 851). "The venue in a criminal case must be proved beyond a reasonable doubt, like any other fact." *Fulch* v. *State,* 90 *Ga.* 472 (16 S. E. 102). With the quoted principles in mind, did the proof in the present case meet the requirement? The record showed that Mrs. Martin's people, with whom she lived, had moved to a place on Wade Avenue in DeKalb County. The witness Fischer testified that the point where he and Mrs. Martin got off the street-car was in DeKalb County. Fischer moved away from this point about a half block, and heard screams. Other people near by testified that they saw Mrs. Martin fall in the street. Mrs. Keel testified: "The place where I saw her is located in DeKalb County." In reference to that place she stated: "There was a pool of blood there. Looked like there had been a scuffle where her hat, pocket-book, and all lay." An officer testified, that in answering the call to the place he went to a point "out Wade Avenue or near Wade Avenue in DeKalb County," that he found

Mrs. Martin lying in the street, and that this was at Woodbine and Wade Avenues.

In *Lee* v. *State,* 176 *Ga.* 215, 218 (167 S. E. 507), in holding that the evidence relating to the venue of the crime was sufficient, the court recognized the principle stated in *Womble* v. *State,* 107 *Ga.* 666 (33 S. E. 630), where it was said: "When all of the evidence introduced on the trial of a criminal case strongly and decidedly tended to show that the offense was committed in the county where the trial was had, and there was no evidence warranting even a bare conjecture that it was committed elsewhere, it will be held that the venue was sufficiently proved. See *Smiley* v. *State,* 66 *Ga.* 754; *Johnson* v. *State,* 62 *Ga.* 299; *Dickerson* v. *State,* 186 *Ga.* 557 (199 S. E. 142).

Counsel for the accused in the present case rely upon the ruling in *Futch* v. *State,* supra, where proof "that the homicide was committed at a point twenty-five or thirty steps distant from a certain house, and that the house was in the county laid in the indictment," was held insufficient to give jurisdiction. In the *Lee* case, supra, this ruling was discussed, but the court with all the Justices concurring declined to follow it so far as it was in conflict with the ruling there made, stating that the ruling in *Futch* v. *State* "may lay down a rule apparently in conflict with the ruling here made, but it is not necessarily in conflict, and we follow the ruling made in the *Womble* case and the two cases above cited which are older than the *Futch* case." That ruling and principle we now reaffirm. Under the foregoing rules, the evidence, though circumstantial, authorized the jury to find that the crime was committed in De-Kalb County; and we hold this ground of the motion likewise without merit.

■ What has been said in division 3 of the opinion requires the conclusion which we have reached, after a painstaking examination of the record, that the jury was authorized to find that the evidence, though largely circumstantial in nature, excluded "every other reasonable hypothesis save that of the guilt of the accused beyond a reasonable doubt." As stated by Chief Justice Jackson in *Thomas* v. *State,* supra, "The issue was, who did the act that made the homicide? The jury found that the defendant did it. Is there legal evidence to sustain the finding? . . The evidence is all circumstantial; yet it points steadily to the prisoner as the

criminal actor in the deed of blood. The finger-posts direct the searcher for truth nowhere else." The verdict is supported by the evidence.　　　　*Judgment affirmed. All the Justices concur.*