1. The evidence was sufficient to authorize the verdict.
2. The assignment of error under the first special ground of the motion for new trial presents no question for consideration, since it does not specify plainly the decision complained of and the alleged error as required by the Code, § 6-901.
3. The court did not err in defining direct evidence along with the definition of circumstantial evidence.
4. Where the court fully defined the law of circumstantial evidence and of direct evidence, it was not error to charge: "Under the law circumstantial evidence authorizes a conviction just as much so as direct evidence."
 No. 14727. JANUARY 5, 1944. REHEARING DENIED FEBRUARY 12, 1944. *Page 318 
Will Pitts was convicted of murder. His motion for new trial was overruled, and he excepted.
The accused was charged with the murder of Mattie Nunnally by beating and striking her with an axe. The evidence for the State was circumstantial, a summary of which is as follows: The deceased was found dead about 5 a. m., October 7, 1942, in the road about eighty feet from the front of the home of her sister where she had spent the previous night. Her head was split open, and near the body was an axe with blood on it. The body was seen about daylight by Paul Hattaway, who passed in a truck, but did not get out and make any examination. He notified the officers, returned to the scene, and was there when the officers arrived about half an hour after having been notified. The deceased was barefooted and apparently had on the clothes she had slept in. Another witness, Albert Radford, who lived about a mile away, drove by in a car and saw the body. He did not get out and make any examination, but after stopping for two or three minutes, drove off to attend to some business, and returned later. When he returned, he saw the accused "about the top of the hill" with seven or eight negroes. The accused wanted to go down to the body, but the witness would not let him. The accused and two or three others got as close to the body "as from here to over there at the wall."
Three people slept in the house that night, the deceased, her sister, Mary Nunnally, and Eugene Turner. A few minutes before the killing, Mary Nunnally and Eugene Turner left the house to go to work. They left the deceased alone in the house, in bed. They were going north up the road about a quarter or a half mile to where there were some dwellings and a sawmill; the dwellings being on the west side of the road, and the sawmill on the east, about opposite the dwellings. Before arriving there, but after going more than half way, they heard a woman screaming, but did not locate the screaming as coming from the house they had just left. About half an hour later while near the dwellings and sawmill, they learned of the killing. The accused was the fireman at the sawmill, and lived about two hundred yards west of the sawmill. Close to where the body was found in the road, tracks were observed leaving the road on the east side and proceeding in a circuitous *Page 319 
route through fields and woods in the direction of the sawmill. The route of the tracks led to the sawmill yard, and the accused was found at the sawmill boiler. It was claimed that the route of the tracks led through damp places and high grass covered with dew. More details in reference to the tracks will be stated later. There was testimony that shortly after the fire was started in the boiler the accused was seen to change his clothes, and that the clothes taken off (trousers and shoes) were wet. There was also evidence that the clothes taken off and found on the premises of the boiler room, were not the clothes he had on when he dressed that morning.
As a motive, the State claimed that the house where the woman was killed had been burglarized two days previously, that two dresses, three shirts, a blouse, and $15 had been taken, and that the burglar had left fingerprints on a mirror. Many in the community, including the accused, knew of the fingerprints, and knew that they were being preserved until the officers could come back and lift them for photographic purposes. Will Worthy testified: "There was some discussion about some fingerprints . . on Tuesday. That was before the killing on Wednesday. Somebody said that they was going to take some fingerprints of it. Will Pitts was there. He said, `What do you think about it?' and I said they ought to take it. Will said there wasn't nothing to it . . that was just negroes talking. Three or four hands were there, and I disremember now who else was there." At the time of the killing, the mirror was shattered. The dead woman did not live in this house, but only spent the night there with her sister. The State's contention was that whoever committed the burglary knew that his fingerprints were on the mirror, waited until the man and woman left the house, and not knowing that the other woman was there, went in to destroy the fingerprints, and upon being discovered, killed the woman with an axe that had been left in the back yard.
Sam Hattaway testified: "Albert Radford and one or two of us were talking to Will Pitts, and asked him why he went to work so early that morning, and he said he was cleaning his boiler and flue out. I examined the boiler and flue to see if they were clean. There was about that much cinders in the bottom. We cleaned one to satisfy ourselves to see if they had been cleaned. We did that to satisfy ourselves. They hadn't been cleaned that morning." *Page 320 
This witness testified further that after the boiler was fired up, but while the accused was absent from the boiler room: "I . . found some burned clothing . . . I knew the flues hadn't been cleaned out that morning, because I told you there was about a quarter-or-half-inch of soot in the bottom. . . I found some burning clothes in that boiler. We got some of it out as wide as my hand and we could tell it was a pretty good pile in there. . . I could tell that burned stuff was clothing, it was on top. I don't know how much was in there. We got a wide shovel full of it out and it fell all to pieces when I tried to handle it. You could see the weaving in it. You couldn't tell whether that was men or women's clothing." This evidence was for the purpose of establishing that the clothing taken at the time of the burglary was sought to be destroyed immediately after the murder.
In connection with the burglary there was evidence that on the Monday of the burglary Robert Mims went to the sawmill about noon. The mill was not in operation, and he saw the accused at an old house about half way from the sawmill to the house that was burglarized. This witness testified: "That road he was in would pass her house. I went down to where he was. I called him. When I started to backout in the road, he dodged me, and I got out to backup and call him, walked down there to the gate, and didn't see him, and he didn't answer me, and I started back to my pick-up, and he was pretty close to the pick-up and asked did I call him. I don't know if he could have heard me call him the first time. I called loud enough. He was not in the road when I called him." On cross-examination, this witness testified further: "I called Will and he didn't answer. When I came back [to the road] and got in my pick-up, . . he was standing in the road where . . John Hattaway's old house was. . . I went back down there, and I called him two or three times, and when he come up . . he . . said, `Mr. Robert did you call me?' and I said `Yes, why did you dodge me?' and he said he didn't. . . I did not see anything in his hands. He told me he was going down there to get a vise. . . Mr. Hattaway left him there to do that. . . Mary B. Nunnally's house [the one burglarized] was still further down the road."
Earnest Nunnally testified: "I knew Mattie Nunnally. . . She was my daughter. . . I live just about a mile from where *Page 321 
my daughter, Mary B. Nunnally, lived. . . I went to the mill that morning about 5 o'clock. . . I did not find anybody at the mill. I called Will Pitts. . . He wasn't there at the time I called him. . . I turned and walked off. . . I met a boy that lived on Mr. John Hattaway's place. . . While I was talking to him, Will come up by the lumber pile. . . We started to walk off and there is a little sawdust pile there, and I got up on that, and then I went down to where he was firing. . . I paid him $2.00 . . two one-dollar bills. . . Will was changing his clothes. . . I said, `Here is your money.' . . When I went to the boiler the first time, the fire just had started in the boiler. . . I didn't pay any attention to the fire the second time I went there, . . but the time I could walk 200 yards . . Son Jordan said, `Do you know Mattie is dead?' . . Took about a minute or a half a minute to walk it. . . I didn't have any business up there. . . I was coming from home to work. . . I was going to thrash peanuts down in the piney woods."
Returning to the evidence as to the tracks that led from the scene of the crime, there were two different kinds of testimony; one kind, the testimony of witnesses as to their observations; and the other kind, testimony as to the conduct of bloodhounds when put upon the tracks. About twelve feet from where the body was found, there were tracks where some one had left the road, crossed the fence, and spread down the bushes. There were weeds and broom sedge, and over the fence tracks could be seen. These tracks led in a circuitous route around a swamp to the yard of the sawmill. One witness testified that they led from the woods to the boiler room. Apparently they were made by the same person. One could not see the tracks right up to the sawmill; but on a clean place they could be seen. There was a heavy dew. The shoes which were found at the boiler room, and which the accused admitted he had worn that morning, fitted the tracks exactly, although though there was no particular mark on the shoes, and any other shoe of the same size would have fitted them equally as well. There was evidence that the party making the tracks was running, as the tracks were about forty inches apart.
About an hour after the killing, the county warden brought his bloodhounds to the place where the body was found. As to the *Page 322 
qualification of his dogs, he testified that he was their regular handler, that they were pure-blooded bloodhounds, trained to track people, and would run any tracks he put them on, that they had never transferred to another track, that when they found the man they were trailing, they would bark and stop, and that the dogs were not vicious. These dogs were placed on the tracks that left the road near where the body was found. They trailed the tracks from the scene of the crime to the boiler room where the accused was. They then trailed to the top of a sawdust pile where the accused stated he had been, and then to the house of Lester Whirley, about one hundred and fifty yards north of the sawmill, where the accused had been to carry water and to eat breakfast. When the dogs went into the boiler room where the accused was, they did not bark or stop, but proceeded as stated above. There was evidence that at the time the dogs came on the sawmill premises, there were other people there, and that previously that morning others had been in the boiler room.
This case was assigned to the writer to present the opinion of the majority of the court. It does not, in some respects, represent the writer's opinion, as will appear in a dissent that follows.
1. While the evidence is wholly circumstantial, there is some evidence to authorize the verdict, and the trial judge having approved the same, there was no error in overruling the motion for new trial on the general grounds.
2. The first special ground is as follows: "Movant should have a new trial because the court erred in failing to charge the jury on the weight and consideration which should be given to the testimony relating to the conduct of track-dogs. Movant contends that the testimony as to the conduct of track-dogs constituted one of the chief and controlling issues in the case, and was the only testimony which could in any way connect movant with the scene of the crime. The failure of the court to charge the jury on this controlling issue in the case was prejudicial and harmful to the movant, in that the jury necessarily considered the conduct of the track-dogs in making their verdict, and necessarily believed that *Page 323 
the bloodhounds trailed defendant from the scene of the crime. Movant contends that there was no testimony that the track-dogs recognized or identified movant as the person they had tracked. Movant further contends that the testimony showed that the track-dogs were not certain and reliable, and the failure of the court to give the jury specific instructions as to what they must find to be true before they could consider such evidence was erroneous and resulted in movant being convicted without sufficient evidence to authorize such conviction."
The Code, § 6-901, provides that exceptions "shall specify plainly the decision complained of and the alleged error." The foregoing ground of the motion for new trial does not meet this requirement. A ground of a motion for new trial alleging that "the court erred in not charging the jury the law of voluntary manslaughter," has been held to be too vague and indefinite as an assignment of error to raise any question for determination by this court, as it does not specify wherein voluntary manslaughter was involved by reason of an assault, other equivalent circumstances, or by mutual combat. Smith v. State, 125 Ga. 300
(54 S.E. 124); Wilson v. State, 156 Ga. 42
(118 S.E. 427); Parham v. State, 180 Ga. 233 (2) (178 S.E. 648);Bryant v. State, 180 Ga. 238 (178 S.E. 651); Jackson v.State, 181 Ga. 753 (184 S.E. 279); Harris v. State,184 Ga. 165, 168 (190 S.E. 554); Norris v. State, 184 Ga. 397
(191 S.E. 375). An assignment of error in the language of that part of the Code, § 26-1009, defining involuntary manslaughter has been held to be too indefinite to present any question for consideration, as it did not state distinctly whether the contention as to the involuntary manslaughter was based on an unlawful act or a lawful act. Williams v. State,176 Ga. 372 (168 S.E. 5). Where the assignment of error stated that the court erred "in failing to charge or refer to or read in said charge to the jury section 26-1006 of the Code of 1933, defining manslaughter, and section 26-1007 of the Code of 1933, defining voluntary manslaughter, and Code section 26-1008, prescribing the punishment for voluntary manslaughter," it was held insufficient as an assignment of error, for the reason that § 26-1006, includes both voluntary and involuntary manslaughter, and § 26-1007 includes voluntary manslaughter where there is mutual combat and where there is no mutual combat, and therefore the assignment of error fails to *Page 324 
specify definitely wherein the court erred. Cornelious v.State, 193 Ga. 29 (2) (17 S.E.2d 156). Where it was alleged that the charge "omitted any instruction as to the legal nature of fraud," this assignment of error was held insufficient, because the reviewing court could not determine the particular principle which the plaintiff in error might have had in mind.Spence v. Morrow, 128 Ga. 722 (58 S.E. 356). An exception that the court failed to instruct the jury "`relative to the right of defendant' to defend himself against one who was attempting to forcibly take his property from his person," was held to be too indefinite in Watkins v. State, 175 Ga. 473
(2) (165 S.E. 269). Also, an exception that a portion of the charge of the court restricted the jury to a determination of guilty or not guilty of the offense charged in the indictment, when the jury "could have found the defendant guilty of a minor offense embraced in the major offense alleged in the indictment," was held to be too indefinite as "to what minor offense the charge excluded." Kennedy v. State, 191 Ga. 22
(11 S.E.2d 179). For other cases where various assignments of error have been held to be insufficient see: McElwaney v. MacDiarmid,131 Ga. 97 (6) (62 S.E. 20); Miles v. State, 182 Ga. 75
(4) (185 S.E. 286); Dickson v. Dortch, 183 Ga. 878 (2) (190 S.E. 26); Frazier v. State, 194 Ga. 657 (2) (22 S.E.2d 404).
3. The second ground of the motion alleges error in the following charge: "The court charges you that direct evidence is that which immediately points to the question at issue. Indirect or circumstantial evidence is that which only tends to establish the issue by proof of various facts sustaining by their consistency the hypothesis claimed. To warrant a conviction on circumstantial evidence, the proven facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis except that of the guilt of the accused." The error complained of is that all the evidence was circumstantial, and that for the court to charge on direct evidence was misleading and confusing to the jury, and was calculated to impress on the jury's mind that there was direct evidence against the movant. We can not agree with this contention. While the evidence connecting the movant with the commission of the crime was wholly circumstantial, still there were facts established by direct evidence, such as that the deceased was dead, and that the accused was identified as *Page 325 
being the person on trial. See Owens v. State, 139 Ga. 92
(76 S.E. 860); Wilburn v. State, 141 Ga. 510
(81 S.E. 444); Martin v. State, 193 Ga. 824 (20 S.E.2d 266);Moss v. State, 43 Ga. App. 109 (2) (158 S.E. 461);Faulkner v. State, 43 Ga. App. 763 (4) (160 S.E. 117).
4. The third ground alleges error in the following charge: "The court charges you further, gentlemen, that circumstantial evidence means a chain of circumstances that link together, and I charge you that a chain of circumstantial evidence is just as strong as its weakest link. Under the law circumstantial evidence authorizes a conviction just as much so as direct evidence. Circumstances are certain things that occur in the commission of a crime, and direct evidence is that which immediately points at the question in issue." The gist of the complaint here is that the expression, "under the law circumstantial evidence authorizes a conviction just as much so as direct evidence," was calculated to impress upon the jurors' minds that circumstantial evidence would authorize a conviction in the same manner as direct evidence. Taking the charge as a whole, the jury could not have been so misled. "No greater degree of mental conviction on the part of the jury is required to convict on circumstantial evidence than on direct testimony." Cargile v. State,136 Ga. 55 (3) (70 S.E. 873).
The fourth ground is covered by the general grounds.
Judgment affirmed. All the Justices concur, except Atkinsonand Wyatt, JJ., who dissent from the first and second divisionsof the opinion, and Jenkins, P. J., absent on account ofillness.